13 F.3d 685
 62 USLW 2427, 127 Lab.Cas. P 33,046,
22 Media L. Rep. 1257,
1 Wage & Hour Cas. 2d (BNA) 1313
 Robert REICH*, Secretary of Labor, United States
Department of Labor, Appellants in No. 92-3746,
v.
GATEWAY PRESS, INC.; John Blanchflower, individually as
employer and as Vice-President of Gateway Press,
Inc., Appellants in No. 92-3747.
 Nos. 92-3746, 92-3747.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 27, 1993.
Decided Jan. 6, 1994.
 
 Judith E. Kramer, Deputy Sol. of Labor, Monica Gallagher, Associate Sol., William J. Stone, for Appellate Litigation.
 Vonda L. Marshall (Argued), Marshall H. Harris, Regional Sol. U.S. Dept. of Labor, Washington, DC., for U.S. Dept. of Labor.
 James A. Prozzi (Argued), Jackson, Lewis, Schnitzler & Krupman, Pittsburgh, PA, for Gateway Press and John Blanchflower.
 John G. Kester, Thomas G. Hentoff, Williams & Connolly, Washington, DC, for Albany Business Journal on Behalf of Gateway Press, amicus-appellees/cross-appellants.
 Before: BECKER, NYGAARD and ALITO, Circuit Judges.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 These cross appeals require us to decide the extent to which newspaper reporters who write for small community newspapers that are part of a newspaper chain are exempt from the wage, hour and records requirements of the Fair Labor Standards Act of 1938, 29 U.S.C. Sec. 201 et seq. ("FLSA" or the "Act"). Involved are two exemptions from the FLSA: the "small newspaper" exemption, Sec. 13(a)(8), which exempts newspapers with circulations of less than four thousand; and the "executive, administrative and professional employee" exemption, Sec. 13(a)(1), which exempts managerial and professional employees. Interestingly, we are the first court of appeals to construe the scope of the small newspaper exemption in the fifty-five years since its enactment.
 
 
 2
 This case arose when the Secretary of Labor (the "Secretary") sued Gateway Press, Inc. ("Gateway"), a publisher of nineteen community newspapers serving the Pittsburgh suburbs, claiming that Gateway had willfully violated the minimum wage, overtime, and records requirements of the FLSA with respect to the wages it had paid its reporters. Gateway's primary defense was that the FLSA did not cover its actions. It argued that all but six of its nineteen newspapers fell within the scope of the small newspaper exemption and that, in any event, its reporters were exempt as "professional" employees. Gateway also contended that any violations it may have committed were not willful.
 
 
 3
 After a six-day bench trial, the district court held that Gateway had violated the FLSA, but that Gateway's violations were limited to only those reporters who had worked for six of the nineteen Gateway papers. The court decided that thirteen of the nineteen papers were within the scope of the small newspaper exemption because each of them had circulations below four thousand. It rejected the Secretary's argument that the court should look to the aggregate circulation of the nineteen papers (or at least to the circulations of the five groups into which the papers were organized) rather than the individual circulations when applying the small newspaper exemption. However, the district court held that none of the reporters were exempt employees, rejecting Gateway's argument that all of its reporters were exempt as "professional" employees under Sec. 13(a)(1). Additionally, the court: (1) held that Gateway's violations were not willful; (2) denied back pay to reporters who did not testify at trial; and (3) held that a data processing manager for Gateway, Thomas Gault, was exempt from the wage and hour requirements because he was an "administrative" employee under Sec. 13(a)(1).
 
 
 4
 For the reasons that follow, we hold that the district court erred in its application of the small newspaper exemption to the Gateway papers. More specifically, the district court should have used an inquiry similar to the inquiry required to determine "enterprise" liability under the FLSA. Under the FLSA, businesses that engage in related activities, under unified operation or common control, and for a common business purpose constitute an enterprise and will be treated as a single entity for purposes of applying the FLSA. Among other things, the enterprise concept aggregates the sales of affiliated businesses to determine whether the businesses have sufficient sales volume to come within the scope of the FLSA.
 
 
 5
 We conclude that the district court should have aggregated the circulation of those publications in the Gateway chain that engaged in related activities, under unified operation and control, for a common publishing purpose. Applying that approach to this case, the circulation of the papers within each of the five groups should have been aggregated. Because the combined circulations of the papers within each geographic group is more than four thousand, we hold that none of the Gateway papers qualify for the small newspaper exemption, and reverse the judgment of the district court to that extent.
 
 
 6
 We agree with the district court that none of the Gateway reporters come within the scope of the professional employee exemption. We therefore hold that all of the Gateway reporters are entitled to the protections of the FLSA, and affirm the district court on this point. In light of our conclusions on the small newspaper and professional employee exemptions however, we must remand so that the court's decision on back wages may be reconsidered. We disagree with the district court's conclusion that the failure to testify at trial is necessarily fatal to an employee's claim for back wages, for there are other modes of proof. But the record in this case is so poorly developed that failure to testify may in fact prove fatal, though the district court may, of course, seek further development of the record. Finally, we affirm the district court's decisions on willfulness and on the administrative employee.
 
 I. THE FACTS
 
 7
 A. The Organization and Operation of the Gateway Newspapers
 
 
 8
 Gateway is a printing and publishing company based in Monroeville, Pennsylvania, that publishes nineteen weekly papers which serve the Pittsburgh suburbs. Although they are part of a chain and share many common features, each of the papers is also local in orientation and outlook. Each is filled with information about the day-to-day events of their respective local communities--marriages, births, deaths, school events, senior citizen and church activities, local crime reports, local political items, et alia--overlooked by the Pittsburgh metropolitan daily press.
 
 
 9
 Gateway maintains strict control over both the organization and content of each of the papers. Although the papers serve different communities, ranging from Moon Township (in the west) to Plum Borough (in the east), major decisions about administration and editorial policy are made from the central office in Monroeville. For example, the publisher[1] decides how many pages will be in each edition;[2] Edith Hughes, the managing editor, oversees all editorial decisions for all nineteen papers; the Monroeville office sells all advertising, makes all employment-related decisions (hiring, firing, payroll), and does all the printing.
 
 
 10
 Gateway has organized the nineteen different papers into five regional groups: East, West, North, South and Carnegie.[3] These groups are the basic administrative and editorial units of the Gateway chain of papers. For example, the newspapers in each group operate out of the same office and have the same editor; they have common operating budgets. Generally, the reporters and editors work on some or all of the papers within a group. In fact, Gateway's payroll records do not reflect whether a reporter worked for one or another of the papers within a group.
 
 
 11
 In addition, Gateway uses the circulation numbers of the groups--not the individual papers--when selling its advertising space. For example, in Gateway's 1989 Advertising Information and Rate Card, Gateway included under "Circulation":
 
 
 12
 Publisher is a member of and audited by Certified Audit of Circulations, Inc. (CAC)
 
 Average circulation for six months ended
 June 30, 1988
 East 24,628
 South 5,905
 
 13
 West 23,980Including Cranberry Review Journal 11,775
 
 
 14
 (Subject to CAC audit)
 
 Carnegie 6,609
 
 15
 Total Market 61,122.
 
 
 16
 The content of the papers within each group is quite similar. A typical Gateway paper has three sections. The first section contains the masthead and some pages of local news specifically pertinent to the community the paper serves. Other pages in the first section contain features and editorials common to the other papers in the regional group. The other two sections, sports and classified advertisements, contain articles and advertisements identical to those appearing in the other papers in the regional group.
 
 B. The Duties of Gateway's Reporters
 
 17
 Because local reporting is the life blood of the Gateway papers, Gateway requires each of its reporters to have a working knowledge of the community to which the reporter is assigned. Reporters primarily generate articles and features using what they have learned about the community, but they also write articles at the direction of their local editors, or of the executive editor, Hughes.
 
 
 18
 Typically, most of the reporters' time (50%-60%) is spent accumulating facts. In fact, most articles are either recast press releases issued under headings such as "what's happening," "church news," "school lunch menus," and "military news" or information taken from the police blotter, obituaries or real estate transaction reports. About once a month a reporter writes a feature article or an editorial.
 
 C. Gateway's Overtime Policy
 
 19
 Gateway pays its reporters a weekly salary. Gateway's official policy is that reporters are not to work more than 40 hours per week. Sometimes, if a reporter needs to work additional hours to complete a story, he or she may get advance approval from Gateway to be paid for the extra work. When reporters need to work more than 40 hours to put out the paper, Gateway tells the reporters to offset any overtime with "compensatory time." That is, they are supposed to work fewer hours on other days during the week to reduce their total weekly hours to 40.[4]
 
 
 20
 Gateway does pay some money to reporters over and above their salary. The paper awards a $25.00 bonus for extra quality work and occasionally gives extra compensation for especially difficult assignments. And Gateway occasionally pays reporters time-and-a-half for overtime work.
 
 
 21
 The Secretary brought this action because, despite Gateway's official policy, reporters routinely work more than 40 hours per week and Gateway does not pay them for the additional hours that they work. Gateway's unofficial policy is that time slips should not total more than forty hours regardless of how many hours the reporter actually has worked. Gateway editors have told reporters that they would not be paid overtime for working more hours. In some cases, Gateway's editors have even returned time slips totalling more than 40 hours to reporters who had recorded their actual hours, telling the reporters to revise their pay slips to reflect forty hours or find work elsewhere. Knowing about this practice, the reporters themselves often put incorrect totals of hours on their time slips.
 
 
 22
 II. PROCEDURAL HISTORY AND THE DISTRICT COURT OPINION
 
 
 23
 The Secretary brought this action on March 15, 1990 under Secs. 6, 7, 11(c), 15(a)(3) and 15(a)(5) of the FLSA. 29 U.S.C. Secs. 206, 207, 211(c), 215(a)(3), 215(a)(5).[5] The Secretary sought to enjoin Gateway and Blanchflower from violating the FLSA's minimum wage, overtime and recordkeeping requirements. The Secretary also sought unpaid minimum wages and overtime pay for Gateway's reporters, stringers, part-time reporters, photographers and a data processing manager. Additionally, the Secretary claimed that three years of back pay were appropriate rather than the normal two, because Gateway's violations had been willful under 29 U.S.C. Sec. 255(a).
 
 
 24
 As noted above, Gateway defended itself by claiming that its employees were exempt from the FLSA on two grounds. First, Gateway argued that its employees worked for small newspapers which are exempt under Sec. 13(a)(8) of the Act. Second, Gateway claimed that its employees were professional employees and therefore were exempt under Sec. 13(a)(1) of the Act.
 
 
 25
 Following a six-day bench trial, the District Court filed an opinion holding that Gateway owed back wages only to the reporters who had worked for six of the nineteen newspapers. The court ruled that the Sec. 13(a)(8) small newspaper exemption applied to all the Gateway papers except the six papers which had circulations of more than four thousand. The court rejected the Secretary's argument that the nineteen different newspapers were, for all practical purposes, the same newspaper and that the circulation of all of the nineteen papers should be aggregated before applying the exemption; when combined, the circulation of the Gateway papers was around sixty thousand, which would easily have taken the papers outside the scope of the exemption.
 
 
 26
 In reaching this conclusion, the court primarily relied on a 1965 opinion letter issued by the Wage and Hour Administrator which stated that
 
 
 27
 ... when a company publishes more than one newspaper, each newspaper is tested separately in order to determine whether the circulation is less than four thousand, provided that, in addition to their separate mastheads, the several newspapers carry different local news items.
 
 
 28
 Op. Letter No. 376, [1961-66 Transfer Binder] Lab.L.Rep. (CCH) p 30,988 (June 29, 1965). According to the court, since the nineteen papers had different mastheads and different local news items, the circulations of the papers should be considered separately.
 
 
 29
 Having disposed of the small newspaper exemption issue, the district court turned to the application of the professional employee exemption. The court held that the reporters were not professional employees within the scope of Sec. 13(a)(1). In reaching its conclusion, the court looked to the definition of "professional" employees in the Secretary's regulations, 29 C.F.R. Sec. 541.3, and interpretations, 29 C.F.R. Sec. 541.303. The interpretations require that a reporters' writing be " 'predominantly original and creative' " to be exempt. 29 C.F.R. Sec. 541.303(f)(1).
 
 
 30
 Following this standard, the District Court found that "while some of [the reporters'] work involved investigative reporting, features, and editorials," their job was "predominantly to fill pages by gathering facts about routine community events and reporting them in a standard format." Because these duties were not "predominantly original and creative," it concluded that the reporters were not "professional" employees within the scope of Sec. 13(a)(1). The court made no distinction in its analysis between reporters who made more than $250 per week and those who made less than $250, notwithstanding the provision in the regulations that requires the court to engage in different tests for professional status depending on whether the employee makes $250 or more.
 
 
 31
 The court then held that Gateway had not willfully violated the FLSA. Relying on McLaughlin v. Richland Shoe Co., 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988), the district court reasoned that Gateway's defenses raised sufficiently legitimate and close questions of law and fact that its actions were not willful violations of the FLSA.
 
 
 32
 The court also held that the Secretary had not proved that Gateway owed back wages for those employees who did not testify at trial. The evidence that the Secretary introduced to prove the amount of back wages owed to the reporters did not indicate which papers employed the non-testifying reporters. Because the court had no way of knowing which of the non-testifying employees had worked for the non-exempt papers, it could not determine which non-testifying reporters were covered by the exemption and which were not. As a result, it awarded back wages only to those reporters who had testified at trial.[6]
 
 
 33
 Following the entry of final judgment, both the Secretary and Gateway filed timely notices of appeal. The Secretary appealed the district court's orders concerning the small newspaper exemption, willfulness, and back wages to non-testifying reporters. Gateway appealed the district court's decision that the reporters were not professional employees. Albany Business Journal, Inc. filed an amicus brief in support of Gateway's appeal.
 
 III. THE FLSA EXEMPTIONS
 A. The Standard of Review
 
 34
 Whether the Gateway newspapers fall within the scope of the small newspaper exemption and whether the Gateway reporters are within the scope of the professional employee exemption are each mixed questions of law and fact. We review the district court's findings of fact (both evidentiary facts and inferences from those facts) under the "clearly erroneous" standard of Fed.R.Civ.P. 52(a). Martin v. Cooper Electric Supply Co., 940 F.2d 896, 900 (3d Cir.1991). Our review of the district court's interpretations and application of the exemptions is plenary. Tudor Dev. Group, Inc. v. United States Fidelity and Guar. Co., 968 F.2d 357, 359 (3d Cir.1992); Cooper Electric Supply, 940 F.2d at 900.
 
 B. The "Small Newspaper" Exemption
 
 35
 Sections 6 and 7 of the FLSA guarantee most employees a minimum wage and overtime pay. 29 U.S.C. Secs. 206, 207. Section 13(a)(8) of the FLSA, however, exempts "any employee employed in connection with the publication of any weekly, semi-weekly, or daily newspaper with a circulation of less than four thousand the major part of which circulation is within the county where published or counties contiguous thereto." 29 U.S.C. Sec. 213(a)(8).
 
 
 36
 1. The Extant Authority.
 
 
 37
 Neither the statute nor the legislative history directly indicate under what circumstances a court should combine the circulations of related publications when applying the exemption. Moreover, there are no appellate decisions on point. Gateway finds support in two Wage and Hour Division opinion letters interpreting the exemption, while the Secretary relies on a forty-three year old district court opinion, McComb v. Dessau, 89 F.Supp. 295 (S.D.Cal.1950). Unfortunately, none of these authorities gives a reliable answer to this question.
 
 
 38
 The Wage and Hour Division opinion letters are from 1946 and 1965. Although the 1946 opinion letter indicates that a publisher of more than one newspaper may treat each paper separately for the purposes of determining whether the circulation is less than the maximum indicated in Sec. 13(a)(8), it qualifies this statement by stating that where "the purported separate publications are properly to be regarded as one and the same newspaper, the total circulation of both papers would have to be considered in determining whether the exemption is applicable." 1948 Wage and Hour Manual (BNA) p 15:328. Thus the 1946 letter merely poses, without answering, the question presented here: what publications are properly regarded as the same newspaper?The 1965 opinion letter is not helpful either. As has been mentioned above, the 1965 letter states that "when a company publishes more than one newspaper, each newspaper is tested separately in order to determine whether the circulation is less than four thousand, provided that, in addition to their separate mastheads, the several newspapers carry different local news items." Op. Letter No. 376, [1961-66 Transfer Binder] Lab.L.Rep. (CCH) p 30,988 (June 29, 1965). But what percentage of each paper needs to be local? Is a single local item sufficient? Or must all of the stories be different? The letter does not say, apparently because the Administrator deliberately wanted to leave the standard unclear, preferring instead to decide things on a case by case basis. Id.[7]
 
 
 39
 More importantly, the 1965 opinion letter's "different local news items" standard seems to have been ignored in an opinion letter issued just four years later. A 1969 Wage and Hour Division opinion letter states that a publisher of a newspaper with a circulation of less than four thousand would not be exempt under Sec. 13(a)(8) because it printed a military newspaper with a circulation of more than four thousand. Op. Letter No. 973 [1676-72 Transfer Binder] Lab.L.Rep. (CCH) p 30,511 (March 27, 1969).[8] Despite the fact that the publisher did no more than handle the advertising and printing of the military newspaper and that only his printing employees worked on both papers, the administrator thought that the publisher could not have the circulation of the two papers counted separately for purposes of the exemption. Id. at p 30,512. The Wage and Hour Division said nothing about the "different local news items" standard.
 
 
 40
 We do not cite the 1969 opinion letter because its reasoning is more persuasive than the 1965 letter. Rather, the 1969 opinion letter merely illustrates the inconsistency and vagueness of the agency interpretations of this exemption. Normally we must give considerable weight to agency interpretations expressed in opinion letters. Pension Guaranty Corp. v. LTV Corp., 496 U.S. 633, 646, 110 S.Ct. 2668, 2676, 110 L.Ed.2d 579 (1990) (Chevron deference appropriate for opinion letters); see also, Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984); Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). Such weight need not be given, however, when the interpretations are, like these, inconsistent, not contemporaneous to the enactment of the statute, and stale (the most recent one in this case being twenty-four years old). See Barnett v. Weinberger, 818 F.2d 953, 961-62, nn. 73 and 74 (D.C.Cir.1987) (marshalling the case law discussing the proposition that "the prestige of a statutory construction by an agency depends crucially upon whether it was promulgated contemporaneously with enactment of the statute and has been adhered to consistently over time"). See also Lynn Martin v. Occupational Safety and Health Review Commission, 499 U.S. 144, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (stating that the consistency of application of interpretations bears on the reasonableness of the agency's position under Chevron ); Batterton v. Francis, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977) (explaining that "[v]arying degrees of deference are accorded to administrative interpretations, based on such factors as the timing and consistency of the agency's position, and the nature of its expertise.").[9]
 
 
 41
 The Secretary submits that we ought to follow the analysis in the Dessau case. In Dessau, the defendants published four weekly newspapers. 89 F.Supp. at 296. All of the writing, editorial and printing work was done from the same location by the same employees. Id. at 297-98. Each paper had a different masthead, and circulated among different groups of subscribers. Id. Otherwise, the papers were virtually identical. The court held that where a publisher published four papers from the same location, had the same employees working on each of them, made no distinction respecting payroll among the papers, and where the other papers had no real distinct corporate or business identity, the circulation of all four should be combined in determining whether the small newspaper exemption applied. Id.
 
 
 42
 Although Dessau is apparently the only case specifically discussing the question of when aggregation of the circulation of a publisher's different papers is appropriate, we believe that it is distinguishable. Unlike the papers in Dessau, the papers in the Gateway chain clearly have different stories, advertisements and editorial oversight. And although much of the content and operation of the Gateway papers is centralized, much of it is not. In addition, Dessau does not provide a clear framework for analyzing the question of when circulations should be aggregated. The two important facts listed in Dessau that apply to the Gateway newspapers--a lack of a separate corporate identity and the existence of a unitary employer/employee relationship--suggest something like a unitary business operations analysis. But it is not clear how such an analysis fits with the interpretation of the Wage and Hour Division that a single publisher can print more than one newspaper and still fall within the scope of the exemption.[10] We assume that at least some degree of centralization of business operations can occur without automatically requiring that the circulation of the different publications be aggregated. Unfortunately, Dessau does not indicate how much centralization is acceptable under the exemption, in part because it does not ground its analysis in the FLSA statutory scheme.
 
 
 43
 The Secretary attempts to overcome Dessau's shortcomings by combining Dessau with the Wage and Hour Division opinion letters and proposing a two part test: "(1) whether the newspapers are properly regarded as one and the same based on their integrated operations, and (2) whether the newspapers contain different news items." [Secretary's Brief at 21]. Since this test is an interpretation created for purposes of this litigation, however, it is not entitled to deference. Bowen v. Georgetown University Hospital, 488 U.S. 204, 212, 109 S.Ct. 468, 473-74, 102 L.Ed.2d 493 (1988). Absent deference, the test is unconvincing, for it draws an artificial line between the operations of the newspapers and their contents, and it essentially makes the unified business operation of a publisher sufficient to remove all of the publisher's publications from the scope of the exemption. Under such an approach, no publisher of more than a single paper who takes advantage of some economies of scale in operating the papers would have the circulations of the papers counted separately for purposes of applying the exemption.
 
 
 44
 Having determined that none of the authorities cited by the parties specifically resolves whether the circulation of the different Gateway papers ought to be combined, we look for guidance to the history of the exemption and the general purposes of the FLSA. We also keep in mind that, because the FLSA is a remedial statute, the Supreme Court has long held that exemptions from the FLSA are to be narrowly construed against the employer. Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960).[11] As we explain below, we conclude that the FLSA's concept of "enterprise" provides the best analogy for determining to what extent a court should aggregate the circulation of different publications when applying the exemption.
 
 
 45
 2. The Enterprise Concept.
 
 
 46
 The minimum wage and overtime requirements apply not only to employees who engage in commerce or in the production of goods for commerce, but also to employees of an "enterprise engaged in commerce." 29 U.S.C. Secs. 206, 207. To be considered an enterprise, a business must satisfy three elements. It must 1) be engaged in related activities, 2) under unified operation or common control, and 3) have a common business purpose. 29 U.S.C. Sec. 203(r)(1); Cruz v. Chesapeake Shipping, Inc., 932 F.2d 218, 229 (3d Cir.1991). If a group of businesses has these three characteristics, the businesses will be treated as a single entity for purposes of applying the FLSA.
 
 
 47
 Congress introduced the concept of enterprise coverage in order to cope with the dramatic change in the nature of retail businesses between 1938 and 1960. Originally, the FLSA was designed to protect the employees of major industrial companies while leaving employees of small local businesses alone. In 1938, retailers were still mostly small local businesses, and they were largely excluded from the scope of the FLSA. By 1961, however, Congress recognized that much retailing was controlled by national chain-type stores, and enacted a bill modifying the FLSA to bring such stores within the scope of the FLSA. By amending the FLSA Congress hoped to update it to take account of the changes in the marketplace:
 
 
 48
 Just as the general store has long since disappeared as a symbol of retailing, the corner grocery store is quickly giving way to the supermarket.... The large mercantile establishments and national systems of chain stores which this bill would make subject to the Federal Wage-hour law bear little resemblance to the small retail businesses the original sponsors of the act sought to exclude. Their claim to be regarded as local retail merchants rests solely on the fact that they distribute and sell goods at retail, although they commonly buy at wholesale and operate in many States throughout the Nation.
 
 
 49
 S.Rep. No. 145, 87th Cong., 1st Sess. (1961) reprinted in 1961 U.S.C.C.A.N. 1620, 1645-46. By introducing the enterprise concept, which aggregated different entities into a single unit for purposes of the FLSA, the 1961 amendments to the FLSA brought the national retail chain stores and their employees within the scope of the FLSA.
 
 
 50
 Of course, Congress still wanted to keep truly local businesses outside the scope of the FLSA. So Congress made "[a]mple provision ... to insure the original intent of the sponsors of the act to exclude the small local retail merchants such as the corner grocer, neighborhood drugstore, barbershop or beauty parlor [would be] carried out." 1961 U.S.C.C.A.N. at 1645-46. Congress did this by creating a "mom and pop" exclusion, see Martin v. Bedell, 955 F.2d 1029, 1032 (5th Cir.1992), requiring that an enterprise have gross sales of a certain amount for FLSA coverage to exist. At present, that amount is $500,000. 29 U.S.C. Sec. 203(s)(1)(A)(ii).
 
 
 51
 Under current law, the question often arises as to whether a business is above or below this dollar threshold. For example, if an entrepreneur owns three businesses, e.g. a gas station, a factory, and a bank, with each having gross sales of $200,000, it is necessary for the court to determine whether the sales of one, two or all three of the businesses should be combined to determine the applicability of the FLSA. 29 C.F.R. Sec. 779.211. The enterprise test is the way to determine whether to combine the dollar figures. See 29 C.F.R. Sec. 779.201. By using the three part test for enterprise, courts have a way to gauge the economic reality of a group of affiliated businesses for the purposes of applying the FLSA. See, e.g., Brock v. Hamad, Inc., 867 F.2d 804, 806-07 (4th Cir.1989) (three affiliated businesses--a lounge that featured topless dancers, an adult bookstore, and an x-rated video arcade--were an enterprise because they were all engaged in providing erotic entertainment to adults); Brock v. Executive Towers, Inc., 796 F.2d 698 (4th Cir.1986) (two affiliated businesses--one that managed an apartment complex and one that managed single family homes--were an enterprise). Cf. Griffin v. Daniel, 768 F.Supp. 532, 536-37 (W.D.Va.1991) (affiliated restaurant, grocery store and trailer park were not an enterprise).[12]
 
 
 52
 The enterprise coverage concept aims at a distinction among businesses that is quite similar to the inquiry invited by the small newspapers exemption. If circulation figures are substituted for dollars, the problem of determining the application of the small newspaper exemption is the same as determining enterprise coverage. This is particularly true in this case in which we are called upon to apply the FLSA to a chain of newspapers. As we have noted, the enterprise concept was specifically introduced into the FLSA to deal with the problem of chains.
 
 
 53
 Use of the enterprise analysis as a rough framework for applying the exemption, not only has pragmatic appeal, but it also has support in the legislative history of Sec. 13(a)(8). In 1938, Congress was careful to restrict the scope of the FLSA so that small, local businesses--the butcher, the baker, the grocer--would not be required to pay minimum wages and overtime. The vast majority of employers in the retail trades were either not covered by the act because their employees were not deemed to be engaged "in commerce" or "in the production of goods for commerce" or were specifically exempted by the retail trade exemption.[13] But because it was common for local newspapers to be sent across state lines--to former residents or relatives--many local publishers were engaged in commerce and fell within the general scope of the FLSA. Without an exemption from the FLSA, the local publisher, who was really just as small and community-based as other small businesses, would have had to meet the requirements of the FLSA.
 
 
 54
 As the sponsor of Sec. 13(a)(8), Representative Creal of Kentucky, put it:
 
 
 55
 ... under this bill, because 1 to 2 percent of a paper's circulation goes outside to people who want to get the hometown paper to see whether or not Lucy got married, or whether Sally's baby has been born yet, because that infinitesimal bit of their business is with people outside the county, these publishers fall under the provisions of this bill, when on each side of this little printshop are the butcher and the baker, who are exempt and who are financially better fixed than he is.
 
 
 56
 83 Cong.Rec., 7445 (May 24, 1938).[14] See also Mabee v. White Plains Publishing Co., 327 U.S. 178, 183, 66 S.Ct. 511, 513, 90 L.Ed. 607 (1946). ("The exemption of small weeklies or semi-weeklies seems to have been adopted on the assumption that without it a newspaper with a regular out of state circulation, no matter how small, would be under the act."). According to this legislative history, the small newspaper exemption is, at base, a provision to ensure that publishers will be treated the same as other businesses.
 
 
 57
 Using the enterprise concept when applying the small newspaper exemption seems to ensure an interpretation that is most consistent with this legislative history. If the original purpose of the small newspaper exemption is to be accomplished, publishers today ought to be treated no differently from other businesses. As has been mentioned, the enterprise approach distinguishes the large regional and national companies from those that are truly local, and it brings within its scope the chain-type businesses. To the extent that newspaper chains are like other types of chain businesses, then, the analysis under the FLSA should be the same. Otherwise, publishers would be treated more favorably under the FLSA than other businesses, and that would not be consistent with the purposes of the exemption. As this legislative history shows, the exemption was to make publishers equal to other businesses--not to make them better off.
 
 
 58
 Of course, application of the small newspaper exemption invites a somewhat different inquiry than the enterprise liability concept, and not just because its application is based on circulation levels, not dollar figures. We recognize that the enterprise concept is, at best, an analogy. Although the enterprise concept with the "mom and pop" exclusion and the small newspaper exemption may both be aimed at excluding small local businesses from the scope of the FLSA, the precise criteria for determining whether a business is local should be different depending on whether the business at issue is a small retailer or a small publisher.
 
 
 59
 We therefore emphasize at least one important difference between the enterprise inquiry in the FLSA generally and the small newspaper inquiry: fidelity to the statutory language of Sec. 13(a)(8) requires that the common business purpose consideration be applied at a fairly specific level. More precisely, the court should make sure that the publications have a common publishing purpose--a purpose that includes both business operations and editorial operations of the publications. This approach will ensure application of the small newspaper exemption in a way that is consistent with the Wage and Hour Division opinion letters which have said that a single publisher may have more than a single newspaper and still come within the scope of the small newspaper exemption. Under this approach, newspapers run by a single publisher which are in effect just different regional editions would have their circulations aggregated to determine the application of Sec. 13(a)(8), while those that are much more widely disparate would not.
 
 
 60
 Thus, in applying the small newspaper exemption to publishers of more than a single publication, the court should aggregate the circulation of those publications that are (1) related, (2) have a unified operation or control, and (3) have a common publishing purpose. In evaluating the first two factors, the focus should be on the different business operations of the publications. The court should look to see to what extent the publisher is taking advantage of significant economies of scale in running the publications. Particularly important would be the use of the same editorial staff and reporters for the different publications. Also important would be the degree to which the publications are after the same market niche in the different communities, the centralization of the publication decisions, the centralization of advertising sales, and other administrative functions of the publisher. The focus of the third consideration should be on the content of the papers--the extent to which the articles, advertisements, and editorials differ among the publications. Minor variations among the publications--different stories on only one page, for example--will not be enough require a court to measure their circulations separately.
 
 
 61
 3. Application of the Enterprise Concept.
 
 
 62
 Under the approach we make applicable here, at least some of the Gateway newspapers' circulations should have been aggregated. First, the Gateway newspapers are certainly engaged in related activities. All of the papers in the Gateway chain supply their different communities with local suburban news otherwise not supplied by the major metropolitan newspapers. The focus of all the papers is on the local happenings in the different communities. Each of the papers is similar in much the same way individual stores in a retail chain are similar. See 29 C.F.R. Secs. 779.206 and 207.
 
 
 63
 Second, the Gateway newspapers clearly satisfy the unified operation or common control requirement. Although the papers serve different communities, major decisions about administration and editorial policy are made from the central office in Monroeville: the publisher decides how many pages will be in each edition; all advertising is sold from the Monroeville office; Edith Hughes, the managing editor, oversees all editorial decisions for all nineteen papers; all employment-related decisions (hiring, firing, payroll) occur at the Monroeville office; and all printing is done at the Monroeville location. All other decisions seem to be made on a group-by-group basis: the newspapers in each group operate out of the same office and have the same editor; they have common operating budgets; and the papers within each group use the same reporters. In addition, Gateway uses the circulation numbers of the groups--not the individual papers--when selling its advertising space.
 
 
 64
 Third, the Gateway newspapers within each geographic group have a common publishing purpose. Although the papers within each of the five regional groups have some different local news items, they are otherwise identical. The first section has a few articles of local flavor, but other pages in the first section and the other two sections contain features, editorials and advertisements common to the other papers in the regional group. The papers within each group are just slight variations of each other. Indeed, they seem to be different editions of the same paper in much the same way major metropolitan daily papers have different regional editions. See, e.g., New Beat for Urban Newspapers: "Zoned Editions with a Hometown Feel," The Wash. Post, Dec. 23, 1992 at A3.
 
 
 65
 In sum, each geographic group of newspapers clearly constitutes one newspaper under the three part test adopted here; hence the circulation figures of the papers within each geographic group should have been aggregated. It is unclear whether, under the test we announce, all nineteen of the papers in the Gateway chain have a common publishing purpose and should have their circulations aggregated. However, we do not need to reach that question here. Because it is undisputed that the circulation within each group is above four thousand, none of the Gateway papers are small newspapers within the meaning of Sec. 13(a)(8). Accordingly, the judgment of the district court must be reversed insofar as it found Gateway the beneficiary of the small newspaper exemption.
 
 C. The "Professional Employee" Exemption
 
 66
 1. The Statutory Framework: the "Long" and "Short" Tests.
 
 
 67
 The district court also held that the reporters were not exempt as professional employees under Sec. 13(a)(1). We believe the district court was correct. Section 13(a)(1) of the FLSA provides that minimum wage and hours requirements of the FLSA do not apply to "any employee employed in a bona fide ... professional capacity." 29 U.S.C. Sec. 13(a)(1). The Department of Labor ("DOL") regulations outline three types of professionals: "learned," "artistic," and "teachers." If newspaper reporters are professionals at all, they must come within the scope of the definition for artistic professionals.[15]
 
 
 68
 The DOL has issued regulations that provide a framework for applying the exemption for artistic professionals. These regulations outline both "long" and "short" tests for artistic professional status. See 29 C.F.R. Sec. 541.3(a)-(e) ("long test"); 29 C.F.R. Secs. 541.3(e) and 541.315 ("short test"). The long test applies to employees salaried below $250 per week. It has many requirements, set forth in Sec. 541.3(a) through (e), the most important being 1) that the primary duty of the employee be "work that is original and creative in character in a recognized field of artistic endeavor" and 2) "the result of which depends primarily on the invention, imagination or talent of the employee." 29 C.F.R. Sec. 541.3(a)(2). The short test applies to employees salaried at more than $250.[16] This is a simpler and more inclusive test which requires only that the employee's primary duty consist of "work requiring invention, imagination, or talent in a recognized field of artistic endeavor." 29 C.F.R. Sec. 541.3(e). The short test does not require work that is "original and creative in character." While the tests are not all that different, it seems clear that any employee who is not a professional under the short test will not be one under the long test.
 
 
 69
 The district court did not distinguish between the Gateway reporters who made more than $250 per week and those who made less than $250 and, as a result, improperly applied the long test to five Gateway reporters who made more then $250 per week. We do not think that this mistake requires us to reverse the district court, however. Because we believe that none of the Gateway reporters would be considered professionals even under the short test, we affirm the district court's ruling on the Gateway reporters--both with respect to those that made more than $250 per week and those that made less.
 
 
 70
 2. Application of the Short Test to the Gateway Reporters.
 
 
 71
 The short test requires us to determine: (a) the employee's "primary duty;" and (b) whether the performance of that duty requires either invention, imagination, or talent. This test, when applied in light of the DOL interpretations,[17] excludes the Gateway reporters from being professionals within Sec. 13(a)(1).
 
 
 72
 a. Primary duty.
 
 
 73
 The DOL interpretations of the professional employee exemption adopt the definition of primary duty found in the interpretations of a completely different exemption, the executive exemption, 29 C.F.R. Sec. 541.103. Section 541.103 provides that, as a "general rule of thumb," primary duty means a duty at which an employee spends the major part, or over 50% of his or her time. Of course, time is not the sole factor to consider. Other factors include the importance of the duties when compared to other types of duties, the frequency with which the employee exercises discretionary powers, freedom from supervision, and pay relative to other employees. 29 C.F.R. Sec. 541.103. See, e.g., Guthrie v. Lady Jane Collieries, Inc., 722 F.2d 1141, 1145 (3d Cir.1983); Western Union, 621 F.2d at 1252.
 
 
 74
 The district court found, and the record shows, that the reporters spent over 50% of their time rewriting press releases, attending municipal, school board and city council meetings, interviewing people, answering phones, and typing wedding announcements, school lunch menus, business reviews, real estate transactions, and church news. The court found that most articles were either recast press releases issued under headings such as "what's happening," "church news," "school lunch menus," and "military news" or information taken from the police blotter, obituaries or real estate transaction reports. Based on these findings, the district court found that the Gateway reporter's job "was predominantly to fill pages by gathering facts about routine community events and reporting them in a standard format." That finding is not clearly erroneous.
 
 
 75
 b. Invention, imagination, or talent.
 
 
 76
 We do not believe that the Gateway reporters' primary duty required invention, imagination, or talent as those terms are used in the DOL regulations. As the DOL interpretations indicate, only a minority of reporters engage in work that depends on invention, imagination or talent: "[T]he majority of reporters do work which depends primarily on intelligence, diligence, and accuracy. It is the minority whose work depends primarily on 'invention, imaging, or talent.' " 29 C.F.R. Sec. 541.303(d).[18] We believe that the Gateway reporters are like the majority of reporters: although their fact gathering duties require intelligence, diligence and accuracy, such duties do not require invention, imagination or talent.
 
 
 77
 The bread and butter work of the Gateway reporters--even those making more than $250--is to collect information that is by and large already out in the community and just needs to be combined into a single source. The Gateway reporters follow up on press releases, attend meetings, interview local officials and record in their articles what they have found. This work does not require any special imagination or skill at making a complicated thing seem simple, or at developing an entirely fresh angle on a complicated topic. Nor does it require invention or even some unique talent in finding informants or sources that may give access to difficult-to-obtain information. In our view, the district court correctly understood that, although occasionally the reporters may have done creative work, their day-to-day duties were routine fact gathering, work that could be done with "general manual or intellectual ability and training." 29 C.F.R. Sec. 541.3(a)(2). Based on these findings, which are not clearly erroneous, we hold that the conclusion that the reporters covered under the "short test" are nonexempt follows as a matter of course.
 
 
 78
 By describing the Gateway reporters' duties as fact gathering, we do not mean that all gathering of facts is necessarily nonexempt work. The regulations and the interpretations are not so categorical. See Sherwood v. Washington Post Inc., 677 F.Supp. 9, 14 (D.D.C.1988), rev'd on other grounds, 871 F.2d 1144 (D.C.Cir.1989). But we believe that the type of fact gathering done by the Gateway reporters is not the type of fact gathering that demands the skill or expertise of an investigative journalist for the Philadelphia Inquirer or Washington Post, or a bureau chief for the New York Times. Cf. id.
 
 
 79
 In sum, while the reporters for Gateway certainly work in a medium in which creativity is possible, it does not mean that their work is artistic within the meaning of Sec. 541.3. After all, if we were to find that the Gateway reporters are in the minority of reporters whose primary duty requires invention, imagination or talent, it is hard to see what reporters would be left in the majority. We are therefore satisfied that the district court properly held that the Gateway reporters were not professionals within the meaning of Sec. 13(a)(1).[19]IV. BACK WAGES TO NON-TESTIFYING EMPLOYEES
 
 
 80
 Because the district court found that at trial some of the Gateway papers were exempt under the small newspaper exemption, and some were not, it was important for it to determine which reporters worked for which papers. Unfortunately for the Secretary, the evidence that was introduced to prove the amount of back wages owed to the reporters did not indicate for which papers the non-testifying reporters worked. Since the court had no way of knowing which of the non-testifying reporters had worked for the non-exempt papers, it could not determine which non-testifying reporters were covered by the exemption and which were not. As a result, it awarded back wages only to those reporters who had testified at trial.
 
 
 81
 Since we have decided that all of the Gateway newspapers are outside the scope of the small newspaper exemption, it is less crucial to know which reporters worked for which newspaper in order to determine what back pay should be awarded. However, it is important to know what amount of back pay is due. Unfortunately, the record in this case is meager, and the Secretary produced evidence of patterns of conduct at the different geographical groups in only an oblique way.
 
 
 82
 The Secretary did present the testimony of 22 out of 70 employees for whom back wages were sought. All of these employees gave virtually identical testimony about the pattern and practice of hours worked at Gateway. The Secretary also provided the wage calculations of the actual hours worked by a number of employees, and the back wages owed. At least one employee from each geographical group testified about the patterns and practices of hours worked. But it is not clear whether all of these employees were reporters. In addition, of the 22 testifying employees, less than half indicated the papers to which they were assigned. It is also difficult to glean from the record how much extra time these reporters spent at work in order to estimate the back wages due.
 
 
 83
 The Secretary's burden in these cases, however, is merely to present a prima facie case. Indeed, it is settled that the burden (with respect to a given employee) is met if it is proved that the employee has in fact performed work for which he was improperly compensated and if the employee produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88, 66 S.Ct. 1187 (1946); Selker Bros., 949 F.2d at 1297-98. If the employer fails to produce adequate records about the employee's wages and hours, the court may then award damages to the employee even though the result may only be approximate. Selker Bros., 949 F.2d at 1297-98.
 
 
 84
 In addition, the Secretary did not have to bring every employee seeking back wages to court to testify. Courts commonly allow representative employees to prove violations with respect to all employees. Mt. Clemens Pottery, 328 U.S. at 680, 66 S.Ct. at 1187 (8 out of 300 employees testified); McLaughlin v. Ho Fat Seto, 850 F.2d 586 (9th Cir.1988) (5 out of 28), cert. denied, 488 U.S. 1040, 109 S.Ct. 864, 102 L.Ed.2d 988 (1989); Donovan v. Williams Oil Co., 717 F.2d 503 (10th Cir.1983); Donovan v. Simmons Petroleum Corp., 725 F.2d 83, 86 (10th Cir.1983) (testimony of twelve employees sufficient to support an award for all former employees); Donovan v. New Floridian Hotel, Inc., 676 F.2d 468 (11th Cir.1982) (23 out of 207 receiving an award; award denied to 56 non-testifying employees); Brennan v. General Motors Acceptance Corp., 482 F.2d 825 (5th Cir.1973) (16 out of 26); McLaughlin v. DialAmerica Marketing, Inc., 716 F.Supp. 812 (D.N.J.1989) (43 out of 393); Marshall v. Brunner, 500 F.Supp. 116 (W.D.Pa.1980) (48 out of 93), aff'd in part, rev'd in part, 668 F.2d 748 (3d Cir.1982). Cf. Secretary of Labor v. DeSisto, 929 F.2d 789, 792 (1st Cir.1991) (not all employees need testify, but one out of 244 was insufficient). Thus, not all employees need to testify in order to prove the violations or to recoup back wages. Selker Bros., 949 F.2d at 1298. Rather, the Secretary can rely on testimony and evidence from representative employees to meet the initial burden of proof requirement. Id. "Once the pattern is established, the burden shifts to the employer to rebut the existence of the violations [ ] or to prove that individual employees are excepted from the pattern or practice." Id.
 
 
 85
 The Secretary appears to have met this burden, but that is not entirely clear, and we prefer to leave that determination to the district court on remand, guided by this discussion. So we will remand to the district court to reconsider the matter. On remand, the district court should carefully scrutinize the evidence before denying or allowing back pay to the non-testifying reporters. See, e.g., New Floridian Hotel, 676 F.2d at 471-73 (the district judge "carefully scrutinized" the evidence upon which the awards of back pay were based, allowed back wages to 151 employees and denied back wages to 56). Although the court may rely only on the trial record, it may also supplement the record and have the Secretary present evidence of the patterns of conduct at each of the geographical groups. Representative reporters from each group could testify about both hours worked and hours paid. The court might also invite evidence from editors or other supervisors in each geographical group indicating hours worked and hours paid. Of course, Gateway should be given the opportunity to present evidence from payroll records that would tend to negate the inferences to be drawn from the testimony of the representative reporters.
 
 V. WILLFULNESS
 
 86
 The Secretary also argues that Gateway's violations of the FLSA were willful and that the applicable limitations period should therefore be three years (instead of only two) under 29 U.S.C. Sec. 255(a). Under the governing standard, Gateway did not commit a willful violation of the FLSA unless it "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]." McLaughlin v. Richland Shoe, Co., 486 U.S. 128, 133, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115 (1988). The district court concluded that the case "presented legitimate questions of law and fact to the court" and that "Gateway reasonably believed that it was entitled to the benefits of the exemptions under 29 U.S.C. Secs. 213(a)(1) and (a)(8)." We agree.
 
 
 87
 The Secretary did present evidence supporting his position. Several employees testified that Hughes, the managing editor, told them not to record more than forty hours on their time slips. And employees who did record more than forty hours were reprimanded and instructed to revise their time slips so that they reflected only forty hours worked. In one case an editor threatened to fire a reporter if he did not do so. Also, despite the fact that Gateway claims that it thought it was exempt, the evidence indicated that Gateway did in fact pay overtime to some employees.[20]
 
 
 88
 On the other hand, the district court found that in many of these cases employees themselves, and without prompting, filled out their time slips inaccurately, so that the additional hours worked were not solely due to Gateway's directives. It would be unfair to use evidence that mainly indicates that the Gateway reporters were committed to their jobs as proof of Gateway's willful violation of the FLSA. More importantly, the district court correctly observed that this case presents not only close questions of law and fact, but also a case of first impression with respect to one of the governing exemptions notwithstanding that it has been on the books for 55 years. Gateway did not in any way thwart settled FLSA doctrine. See Hilbert v. District of Columbia, 784 F.Supp. 922, 925 (D.D.C.1992) ("Although [the defendant] ultimately acted on the basis of an erroneous legal interpretation, it did not thwart settled law or recklessly disregard pertinent legal questions."). The district court concluded that under all the circumstances, Gateway's actions were not willful. We are not inclined to disturb this conclusion.
 
 VI. CONCLUSION
 
 89
 For the foregoing reasons, we hold that none of the Gateway newspapers are exempt under the small newspaper exemption of Sec. 13(a)(8); that none of the Gateway reporters are professional employees within the meaning of Sec. 13(a)(1); that the case must be remanded for determination of back wages for non-testifying employees; and that Gateway's actions were not willful. We will therefore affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.
 
 
 90
 ALITO, Circuit Judge, dissenting in part.
 
 
 91
 I must disagree with the court's interpretation of the "small newspaper" exemption contained in the Fair Labor Standards Act (FLSA), 29 U.S.C. Sec. 213(a)(8). This provision exempts "any employee employed in connection with the publication of any weekly, semiweekly, or daily newspaper with a circulation of less than four thousand the major part of which circulation is within the county where published or counties contiguous thereto" (emphasis added). The court interprets this language to apply only if the "enterprise" of which the newspaper is a part has a circulation of less than 4,000. The court cites no legislative history directly supporting this interpretation, and the court forswears reliance on the sparse administrative interpretations that are available. Under these circumstances, I cannot accept the court's interpretation.
 
 
 92
 Looking solely at the statutory language, I do not think the term "newspaper" should be interpreted to mean "enterprise." When the FLSA was enacted, Congress surely recognized that a small "newspaper" could be part of a larger enterprise; newspaper chains were not unknown. Accordingly, if Congress had meant to refer to an "enterprise," it would, I presume, have used that or some comparable term. I would, therefore, interpret the term "newspaper" to mean what it says: an entity that is, in reality and not just in name, a separate newspaper.
 
 
 93
 This is the definition propounded in a 1946 Wage and Hour Division opinion letter, which stated that a publisher may treat newspapers separately in determining whether their circulations exceed 4,000 unless "the purported separate publications are properly to be regarded as one and the same newspaper." 1948 Wage & Hour Manual (BNA) at 328. Similarly, a 1965 Wage and Hour Division opinion letter stated that "when a company publishes more than one newspaper, each newspaper is tested separately in order to determine whether the circulation is less than four thousand, provided that, in addition to their separate mastheads, the several newspapers carry different local news items." Op.Letter No. 376, [1961-1966 Transfer Binder] Lab.L.Rep. (CCH) p 30,988. As the court notes, a 1969 Wage and Hour opinion letter does not seem entirely consistent with these earlier opinion letters. See Op.Letter No. 973, [1967-1972 Transfer Binder] Lab.L.Rep. (CCH) p 30,511. This letter, however, expressly stated that "an unequivocal opinion" could not be given because "sufficient information" had not been provided.[1] For this reason, I would not give this opinion letter much weight. But even if this opinion letter deprives the prior opinion letters of any entitlement to deference that they would otherwise enjoy, I still think that their interpretation of the statutory language is more accurate than the court's.
 
 
 94
 The district court in this case applied the interpretation set out in the 1965 opinion letter. Accordingly, I believe that the district court employed the correct legal standard. I am also not convinced that the district court misapplied this standard to the facts of this case. I would therefore affirm the order of the district court.
 
 
 
 *
 Pursuant to Rule 43(c), Fed.R.App.P
 
 
 [1]
 From 1988 to 1991, John Blanchflower, a co-defendant in this case, was publisher. Currently, John Alymer is the publisher
 
 
 [2]
 The size of each newspaper is determined by the publisher in conjunction with the advertising staff
 
 
 [3]
 The East Group includes the Penn Hills Progress, the Churchill Progress (now Woodland Progress ), the Plum Advance Leader, the Oakmont Advance Leader, the Times Express, the Wilkinsburg Gazette and the Murrysville Star. The Carnegie Group includes the Bridgeville Area News, the Community Item, and the Carnegie Signal Item. The South Group includes the South Hills Record, the West Mifflin Record, and the Brookline Journal. The West Group includes the Coraopolis Record and the Moon Record. The North Group includes the Sewickley Herald, the Bellevue Suburban Life (now the North Journal ), and the Franklin Park Herald. Gateway also publishes the Cranberry Journal, which Gateway has not assigned to a group
 Of the nineteen papers, six have circulations of over four thousand: The South Hills Record, the North Journal, the Cranberry Journal, the Penn Hills Progress, the Times Express, and the Murrysville Area Star.
 
 
 [4]
 The relevant provisions of the Editorial Handbook provide:
 .... 5. Reporters are not to work more than 40 hours a week. Compensatory time should be taken the day after deadline day, not on Fridays. Special exceptions can be granted by the local editor.
 
 
 [6]
 Any time needed above 40 hours to complete assignments must be approved in advance by the managing editor
 
 
 [8]
 Pay slips for reporters are to reflect the actual hours worked each day
 
 
 [5]
 The district court had subject matter jurisdiction pursuant to 29 U.S.C. Sec. 217
 
 
 [6]
 The district court also found that Thomas Gault, a data processing manager, was an administrative employee and fell within the exemption provided by Sec. 13(a)(1) and 29 C.F.R. Sec. 541.2(a)(1). Section 541.2(a)(1) provides that the administrative exemption applies to: "(1) The performance of office or nonmanual work directly related to management policies or general business operations of his employer or his employer's customers." Gault had testified that much of his time had been spent doing "clerk" type work, but the district court found that his duties were administrative within the contemplation of Sec. 13(a)(1) and 29 C.F.R. Sec. 541.2(a)(1). The Secretary claims that this ruling was also incorrect
 
 
 [7]
 "In view of the limited number of instances in which questions concerning the application [of the small newspaper exemption] have arisen, review on a case by case basis would appear to be a satisfactory method of handling any problem that might arise." Id
 
 
 [8]
 The letter states in part:
 You indicate that a member of your association publishes a weekly newspaper of under 4,000 circulation. In addition, he prints a military base paper of more than 4,000 circulation. He has a contract with the base under which he sells the advertising and handles the printing. He neither gathers nor edits the news. The base paper is not circulated out of the state, but it contains national advertising which he handles. Only his printing employees work on both the weekly and the base newspaper....
 [I]t would appear that the publisher's work in connection with the printing and in particular with the sale of advertising for the military base newspaper would remove it from the application of the exemption provided by section 13(a)(8) of the Fair Labor Standards Act.
 Id. at pp 30,511-30,512.
 
 
 [9]
 Of course, we must still give some weight to the opinion letters, and full deference is appropriate to the extent the opinion letters have common ground. More specifically, the opinion letters suggest that a single publisher may publish more than a single newspaper with an aggregate circulation of more than four thousand and still come within the scope of the exemption. This interpretation of the exemption is a consistent theme running through the various opinion letters and is entitled to deference in interpreting the small newspaper exemption
 Similarly, the Wage and Hour Division has consistently held that the word "circulation" includes "all copies of the publication circulated or distributed by mail or otherwise, whether paid for or free." Wage and Hour Opinion Letter, Labor Law Service (CCH) p 33,081 (November 15, 1941). See also Wage and Hour Opinion Letter 208,575 Labor Law Service (CCH) p 33,593 (March 12, 1941) (a publisher of a weekly publication with 3000 paid circulation and 3000 free advertising copies was not within the scope of the exemption); Wage and Hour Opinion Letter, Labor Law Service (CCH) p 33,065 (October 17, 1941) (sample copies are included in circulation figures). Thus we will look to the sum of the paid subscription and the free copies distributed by each of the Gateway papers to measure the circulation figures of the individual papers.
 
 
 [10]
 Such an interpretation is entitled to full Chevron deference. See note 9, supra
 
 
 [11]
 Gateway thus has the burden of proving that each of the exemptions applies clearly and unmistakably. See Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 206, 86 S.Ct. 737, 747, 15 L.Ed.2d 694 (1966); Cooper Electric Supply, 940 F.2d at 900
 
 
 [12]
 This court and others have often applied an "economic reality" test when interpreting the FLSA. See e.g., Martin v. Selker Brothers, Inc., 949 F.2d 1286 (3d Cir.1991) (looking to economic reality to determine whether a gas station worker was an independent contractor or an employee); Donovan v. DialAmerica Marketing, Inc., 757 F.2d 1376, 1382 (3d Cir.) cert. denied 474 U.S. 919, 106 S.Ct. 246, 88 L.Ed.2d 255 (1985); Bedell, 955 F.2d at 1033 n. 9 (5th Cir.1992) (same); Marshall v. Western Union Telegraph Co., 621 F.2d 1246, 1252 (3d Cir.1980) (interpreting Sec. 13(a)(1) and the relevant regulations, 29 C.F.R. Sec. 541.1 et. seq., the court construed the regulations in a manner consistent with economic reality)
 
 
 [13]
 Section 13(a)(2), the retail trade exemption, was repealed in 1989
 
 
 [14]
 Additional remarks from representative Creal illustrate both of the context and spirit of the exemption:
 You very carefully exempted the retailers in crossroad towns. The department stores and other businesses are exempted. But here is a sleepy town of 800 or 1000 people where every businessman in the town is exempted but the little country publisher, the one who publishes the news about the births, the deaths, and the marriages, and prints church notices of the community. In 90 percent of these cases this man is in the poorer financial circumstances than any of his neighbors up and down the street who are specifically exempted. There are 3000 to 4000 of these publishers and their average circulation is 1200. They are an uncontaminated, free and independent press. They have never been subsidized. Be the publisher Democrat or Republican, his opinions, good or bad, are his own.... All of you who have country newspapers in your district, vote for this amendment.
 
 
 [83]
 Cong.Rec. (May 24, 1938)
 
 
 [15]
 The "learned" exemption deals with professions which have specified educational requirements such as law or medicine. See Sec. 541.3(a)(1) ("long test" for learned professionals); Sec. 541.3(e) ("short test"). The case law has held that reporters do not come within the scope of the learned exemption. See, e.g., Sun Publishing Co. v. Walling, 140 F.2d 445 (6th Cir.), cert. denied, 322 U.S. 728, 64 S.Ct. 946, 88 L.Ed. 1564 (1944). Teachers are treated separately as a third group which is not pertinent here. See 29 C.F.R. Sec. 541.3(a)(3)
 Amicus has uncovered a statement made by then Assistant Attorney General Robert Jackson during hearings on the bill which might suggest that newspaper reporters are always professionals. See Joint Hearings on S. 2475 and H.R. 7200 Before the Committee on Education and Labor, U.S. Senate, and the Committee on Labor, House of Reps., 75th Cong., 1st Sess. 81-82 (1937) (When asked if newspapers reporters were within the scope of the FLSA, Jackson said, "I would not think that the newspapermen would be included because I regard them as a profession"). Although Jackson's statements indicate that he believed newspaper reporters would fall outside the scope of the FLSA, statements made by witnesses at committee hearings are not significant indicators of legislative intent. Kelly v. Robinson, 479 U.S. 36, 51 n. 13, 107 S.Ct. 353 n. 13, 93 L.Ed.2d 216 (1986) ("We acknowledge that a few comments in the hearings ... may suggest that the language bears the interpretation.... We decline to accord any significance to these statements."); McCaughn v. Hershey Chocolate Co., 283 U.S. 488, 493-94, 51 S.Ct. 510, 512, 75 L.Ed. 1183 (1931) (statements "made to committees of Congress or in discussions ... by representatives who were not in charge of the bill ... are without weight in the interpretation of the statute."). See also Occidental Chemical Corp. v. Power Authority of New York, 786 F.Supp. 316, 329 n. 20 (W.D.N.Y.1992) (citing cases). Although a court might give some weight to these statements in the absence of Labor Department regulations and interpretations, in this case the regulations and the interpretations squarely indicate that at least some reporters are outside the scope of the exemption.
 
 
 [16]
 The short test was added to the FLSA in 1949 in large part because the DOL felt that salary level turned out to be a good proxy for determination of professional status:
 The experience of the Divisions has shown that in the categories of employers under consideration the higher the salaries paid the more likely the employees are to meet all the requirements of the exemption, and the less productive are the hours of inspection time spent and analysis performed. At the higher salary levels in such classes of employment, the employees have almost invariably been found to meet all the other requirements of the regulations for the exemption.
 U.S. Department of Labor, Report and Recommendations on Proposed Revisions for Regulations, Part 541 22-23 (1949). The original salary level was set at $100. 14 F.R. 7705, 7706 (1949). It was subsequently changed to $250. 40 F.R. 7092 (1975). We do not understand why, in view of the enormous inflation since 1975, the $250 division between long and short tests has not been significantly changed. Although the regulation was amended to increase the relevant dollar figure to $320 in 1981 and $345 in 1983, the amendments were postponed indefinitely. 29 C.F.R. Sec. 541.3(e) (1992) at pp. 348-49.
 
 
 [17]
 The DOL interpretations do not have the force of law. 29 C.F.R. Sec. 775.1. See also, Batterton v. Francis, 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977) ("a court is not required to give effect to an interpretive regulation."). They are entitled to some deference, however. Id. We reject amicus' argument that the Secretary's interpretations should be given little weight because various DOL agencies, e.g., the Bureau of Labor Statistics, have classified reporters as professionals or as engaged in a "creative occupation." When construing the FLSA and its exemptions, courts should look primarily to the purpose of the act itself --and not interpretations of the same or a similar term made in other contexts. Professional exemption status under the FLSA differs from professional status for the purpose of gathering statistics. We have in the past denied exempt status to some employees, even though their job duties met coverage tests under other acts enforced by the Secretary. See Guthrie v. Lady Jane Collieries, 722 F.2d 1141, 1146 n. 3 (3rd Cir.1983) ("We do not attach importance to the [union] designation of the foremen as management. The controlling issue here is not the question of what constitutes an exempt supervisor [for the purposes of the NLRA], but rather what were the extent and nature of the duties performed by the foremen within the context of the FLSA and the tests prescribed by the regulations promulgated pursuant to the act.")
 We also disagree with amicus' characterization of the interpretations as being "self-contradictory" because they state that "many" reporters are exempt while "many" are not. The interpretations merely recognize that the determination of whether a reporter is a professional does not depend on the title that a paper gives a reporter. Rather, it instead depends upon the specific characteristics of a given reporters' job. There is a difference in duties between reporters writing for the Washington Post and those who write for a local weekly newspaper. It would defeat the purposes of the exemption to lump them into the same category merely because their employers called them professionals. Cf. Sherwood v. Washington Post, 677 F.Supp. 9, 12, 14 (D.D.C.1988), rev'd on other grounds, 871 F.2d 1144 (D.C.Cir.1989).
 
 
 [18]
 Although this interpretation of the phrase "invention, imagination, or talent" seems to refer to the phrase as it is used in Sec. 13(a)(2) (the long test) rather than as it is used in Sec. 13(e) (the short test), there is nothing to suggest that such a phrase has a different meaning in the two different parts of the regulations. Indeed, as a matter of statutory construction, where one word is used in one place, it should have the same meaning in another place in the same statute. See Mississippi Poultry Ass'n. v. Madigan, 992 F.2d 1359, 1363 (5th Cir.1993) ("another established canon of construction provides that a word used in different parts of a statute should be construed to have the identical meaning throughout the entire statute."). There is no reason to think that this principle should not equally apply to regulations. We reject amicus' argument that the interpretations in Secs. 541.301 to 314 apply exclusively to the long test. It cites no authority for this proposition. Indeed, the law in this circuit appears to be to the contrary. When construing the short test for both executive employees and administrative employees, we have looked to what amicus characterizes as interpretations of the "long test." Lady Jane Collieries, 722 F.2d at 1141 (executive employees); Cooper Electric Supply, 940 F.2d at 902, 904 (administrative employees)
 
 
 [19]
 The Secretary has also appealed the district court's finding that Thomas Gault, a data processing manager, was an exempt employee. The district court correctly relied on the regulation governing the administrative employee exemption, which "asks ultimately whether an employee's primary work duty is 'directly related to the management policies or general business operations of his employer.' " Cooper Electric Supply, 940 F.2d at 902 (quoting 29 C.F.R. Sec. 541.2(a)(1)). The Secretary argues that, despite his title, Gault actually performed the duties of a data entry clerk and that he should be considered a "production" rather than an "administrative" employee. The district court considered this characterization of the facts and rejected it. The district court found that Gault was hired as a data processing manager in July 1990; his salary was $33,000; Gault was hired to integrate Gateway's three different computer systems; and that Gault apparently did his job badly and was fired. The court found that Gault knew he had been hired for an exempt position and that "notwithstanding Mr. Gault's testimony that much of his time was spent performing 'clerk' work below the level of manager," he was in fact exempt. These findings are not clearly erroneous. Given the facts the district court actually found, its application of the administrative employee exemption was correct
 
 
 [20]
 The Secretary has also argued that since this was not the first time Gateway was investigated by the DOL, Gateway knew that it was violating the wage and hour laws. In 1975 the DOL's Wage and Hour Division investigated Gateway and found that it had not complied with the FLSA minimum wage and overtime compensation requirements. Gateway entered into a consent judgment which enjoined it from committing further violations of the Act. The district court found, however, that the 1975 consent decree involved different corporate defendants. The court also noted that the document did not give any notice to Gateway relevant here because it did not provide any indication "that a reporter or editor was a covered employee under the Wage and Hour Law." This reasoning seems correct, and we are satisfied that it was within the court's discretion to exclude this consent judgment from consideration
 
 
 [1]
 The entire opinion letter states:
 You indicate a member of your association publishes a weekly newspaper of under 4,000 circulation. In addition, he prints a military base newspaper of more than 4,000 circulation. He has a contract with the base under which he sells the advertising and handles the printing. He neither gathers nor edits the news. The base newspaper is not circulated out of the State, but it contains national advertising which he handles. Only his printing employees work on both the weekly and the base newspaper.
 Your letter does not contain sufficient information for us to give you an unequivocal opinion in the matter. However, it would appear that the publisher's work in connection with the printing and in particular with the sale of advertising for the military base newspaper would remove it from the application of the exemption provided by section 13(a)(8) of the Fair Labor Standards Act.
 We would also like to direct your attention to the possible application of the McNamara-O'Hara Service Contract Act and the Walsh-Healy Public Contracts Act to the newspaper printing contract entered into with the military base. However, without additional details on the contract, we are not in a position to give you a definitive answer on the application of these laws. If you should desire to submit more information on this contract, we would be pleased to consider the matter further.