Lynne WANG, Yu Fang Ines Kai, and Hui Jung Pao, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

CHINESE DAILY NEWS, INC., and Does 1–10, et al., Defendants.

No. CV 04–1498CBM(JWJX).

United States District Court, C.D. California, Western Division.

June 7, 2006.

See, also, 2006 WL 1624548.

Della Bahan, Peter Bibring, Bahan & Associates, Pasadena, CA, for Plaintiffs.

Steven D. Atkinson, Mark T. Palin, Scott K. Dauscher, Atkinson, Andelson, Loya, Ruud & Romo, Cerritos, CA, for Defendants.

## ORDER RE: PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

CONSUELO B. MARSHALL, District Judge.

The matters before the Court, the Honorable Consuelo B. Marshall, Judge, presiding, are cross motions for summary judgment filed by the parties.

### JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

### BACKGROUND & PROCEDURAL HISTORY

Plaintiffs allege multiple labor violations by Defendants, pursuant to the Fair Labor Standards Act ("FLSA"), the California Labor Code, and the California Business and Professions Code § 17200 *et seq.* On January 20, 2005, the Court issued an amended order granting Plaintiffs' motion for class certification pursuant to Fed. R.Civ.P. 23(b)(2) and directing that notice and an opportunity to opt out be given to class members consistent with Rule 23(c)(2)(B).[1] Jan. 20, 2005 Order at 13:4–16:12.

On January 17, 2006, the parties filed cross-motions for summary judgment. Both parties seek summary judgment on the following issues: (1) Defendant Chinese Daily News' ("CDN") vacation "buy

1. The class was defined as including all former, current, and future non-exempt employees of Defendants who worked at Chinese Daily News in Monterey Park, California at any time since March 5, 2000. Nov. 23, 2005 Order at 3:7–9.

back" policy, (2) the validity of wage statements issued by CDN, and (3) CDN reporters' entitlement to overtime. Additionally, Plaintiffs seek summary judgment on the issue of how overtime pay is calculated for CDN employees and Defendants seek summary judgment on additional issues implicating the availability of overtime and whether meal and rest breaks have been provided to the employees.

## LEGAL STANDARD

Summary judgment against a party is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the nonmoving party will have the burden of proof at trial, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *See id.* If the moving party meets its initial burden, the nonmoving party must then set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ In judging evidence at the summary judgment stage, the Court does not make credibility determinations or weigh conflicting evidence and draws all inferences in the light most favorable to the nonmoving party. *T.W. Elec. Svc., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987). The evidence presented by the parties must be admissible. Fed.R.Civ.P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Pub. Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

### I. Issues for Which Both Parties Seek Summary Judgment

#### A. Whether CDN's Vacation Buy Back Policy Violates the Law

Plaintiffs allege that CDN's vacation buy back policy violates California state law. It is undisputed that CDN gives their employees vacation leave. CDN's policy provides that, during their first year, employees are entitled to 6 days of vacation. Decl. of Irene Chen in Supp. of Defs.' Mot. for Summ. J. ("Chen Decl."), Ex. B ("Vacation Policy"). For each additional year of employment employees accrue an additional day of vacation (e.g., year 2, 7 days of vacation, year 3, eight days of vacation, up to 16 years and 21 days of vacation). *Id.* CDN's purported vacation policy further states that "the unused vacation days each year can be carried forward to the following year." *Id.* However, the vacation policy also states that "the accumulated vacation days cannot exceed 30 days. Money shall be paid for unused vacation days exceeding 30 days at $ 64 per day." *Id.*

■ Under California law, when a contract provides for paid vacation time, vested vacation time is to be paid to an employee as wages at his or her final rate. Cal. Labor Code § 227.3. The California Supreme Court has held that a proportionate right to a paid vacation "vests" as the labor is rendered. *Suastez v. Plastic Dress–Up Co.,* 31 Cal.3d 774, 784, 183 Cal. Rptr. 846, 647 P.2d 122 (1982). However,

California appellate courts have also held that a "no additional accrual" policy is permitted under California law. "If the employment agreement precludes an employee from accruing more vacation time after accumulating a specified amount of unused vacation time (a 'no additional accrual' policy), the employee does not forfeit vested vacation pay." *Boothby v. Atlas Mechanical,* 6 Cal.App.4th 1595, 1601–02, 8 Cal.Rptr.2d 600 (1992).

CDN purchases the "unused vacation days" at $ 64 per day regardless of the hourly rate earned by the employee.[2] The critical question then, is whether the "unused vacation days" being purchased are already vested or accrued (in which case the law requires CDN to purchase them at the employees' actual daily wage) or whether they are not vested because CDN's vacation policy precludes employees from accruing more than a specified amount of vacation time. *Boothby,* 6 Cal. App.4th at 1601–02, 8 Cal.Rptr.2d 600.

CDN's vacation policy initially appears to foreclose Plaintiffs' claim as it clearly states that "accumulated vacation days cannot exceed 30 days." However, Plaintiffs provide undisputed evidence that employees are allowed to "accumulate" far in excess of the purported 30–day cap and that Defendants themselves construe excess vacation days as "accrued." Indeed, Defendants' own labor consultant, Larry Wong, testified in some detail about the policy. Wong testified that employees often "accrue" many vacation days, giving the example of an employee who had accrued 65 days. Dep. of Larry Wong at 505:13–24. Wong testified that CDN policy is to tell employees that CDN will purchase any vacation employees have in excess of 30 days that the employees have "been carrying over all these years ..." *Id.* at 505:19–24. Wong also testified about the forms used by CDN to track vacation repurchased from employees. Those forms establish that employees routinely carried over as much as 50, 60 or 70 days of unpaid vacation time. *See, e.g.,* Decl. of Peter Bibring in Opp. to Defs' Mot. for Summ. J. ("Bibring Decl. in Opp."), Ex. E (2002 and 2003 CDN Vacation Reports); Chen Decl., Ex. C.

Indeed, in one document discussed during Wong's deposition, all seven employees listed were shown to have more than 50 days of vacation. Bibring Decl. in Opp., Ex. E (2002 Vacation Report). In another document, two of the twenty-two employees listed accumulated more than 70 days vacation, another three accumulated more than 60 days, and seven other employees more than 50 days. *Id.* (2003 Vacation Report).[3] More significantly, Defendants

---

**2.** There is no dispute that at least some CDN employees earn in excess of $ 8 per hour and, if paid a full day's wages in compensation for "unused vacation days", would receive more than $ 64.

**3.** Defendants assert that the vacation reports show employees having so many vacation days because some employees retain their thirty days in one year and then receive additional vacation days from the next year. However, this explanation does not resolve the issue for a number of reasons. First, even if Defendants' explanation was true, employees should be able to accumulate no more than 51 days (30 days carried over plus 21 additional days, the maximum number of new days an employee can earn in a year). The reports showed employees accumulating in excess of 50, 60, and even 70 days. Second, Defendants' vacation policy prohibits employees from "accumulating" in excess of thirty days. Chen Decl, Ex. B. The vacation reports show that the employees accumulate far in excess of thirty days. Defendants' strained efforts to distinguish between "accumulated accrued days" versus "accumulated non-accrued days" find no support in the evidence. Nor do Defendants cite to any cases supporting such a distinction. Indeed, when discussing "no additional accrual" policies, the *Boothby* court specifically explained that it meant policies which capped accumulation of vacation days, meaning once employees have

rely on document titled the "CDN Vacation Buy-out Sheet" to "buy" unused vacation days. Chen Decl., Exs. E, G, I. The buy-out sheet describes the vacation time Defendants are purchasing as "unused *accrued* vacation days." *Id.* (emphasis added). Their own administrative documents establish that the vacation days purchased are considered, by Defendants themselves, to be *accrued* vacation time.

Additionally, Chen, a CDN Accounting Department employee, submitted a declaration in support of Defendants' motion in which she testified that she was very familiar with CDN's vacation policies and was charged with tracking CDN employee's vacation. Chen Decl. ¶ 2. However, at her deposition, Chen testified that she was not sure when the vacation policy was created or whether it had even been distributed to employees. Dep. of Irene Chen at 95:5–96:14.

█ In light of CDN's actual practice, Defendants' reliance on the language contained in its vacation policy does not create a genuine issue preventing the grant of summary judgment for several reasons. *See, e.g., Anderson,* 477 U.S. at 252, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which a jury could reasonably find for the opposing party.").[4] First, Defendants' actual practice, established by undisputed evidence, contradicts the purported policy to cap accumulation at thirty days. Second, Defen-

dants have not established that CDN's employees have been given notice of the vacation policy. Third, Defendants' own documents, submitted in support of their motion, establish that CDN considered the vacation time it was purchasing to have been "accrued." Pursuant to Cal. Labor Code § 227.3 and *Suastez,* Defendants' "buy back" of unused, but accrued, vacation days should have been computed by reference to the employee's regular rate of pay. Accordingly, the Court GRANTS Plaintiffs' motion and DENIES Defendants' motion with regard to CDN's vacation buy-back policy.

**B. Whether CDN's Wage Statements Violate California Law**

Both parties move for summary judgment on the issue of whether the wage statements CDN issues to its employees violate California law. The issue is framed as a legal argument as the few relevant material facts are not in dispute. Cal. Labor Code § 226 requires that wage statements contain, among other things,

> (2) total hours worked by the employee, except for any employee whose compensation is solely based on a salary and who is exempt from payment of overtime ... and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee.

---

accumulated 30 days, they could not accumulate any more days until they used some of their vacation time. 6 Cal.App.4th at 1602, 8 Cal.Rptr.2d 600.

**4.** Defendants cite to the declaration of Larry Wong to establish that CDN was not purchasing accrued time. *See* Decl. of Larry Wong in Supp. of Defs.' Opp. to Pls.' Mot. for Summ. J. ("Wong Decl. in Opp.") ¶¶ 7–16. However, during his deposition Wong testified extensively about the vacation buy back policy,

repeatedly describing the time as "accrued," and describing how employees were routinely accumulating far in excess of thirty days. Accordingly, the Court considers Wong's declaration to be a sham affidavit. *See Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999)(explaining that an issue of fact cannot be created by a witness' declaration contradicting his or her own deposition or other sworn testimony).

While there is some dispute, addressed in other sections of this order, as to which employees are exempt or non-exempt, there is no dispute that at least some members of the class are non-exempt employees. It is also undisputed that CDN's wage statements do not state the actual hours worked by the employees nor an hourly wage rate. Rather, with regard to the total hours, CDN concedes that the wage statements always indicate 86.66 for hours worked, regardless of the actual hours worked, the length of the pay period, or the number of work days in the pay period.[5] *See Cicairos v. Summit Logistics, Inc.*, 133 Cal.App.4th 949, 955, 35 Cal.Rptr.3d 243 (2005).

Section 226(e), provides that an employee

suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars ($ 50) for the initial pay period in which a violation occurs and one hundred dollars ($ 100) per employee for each violation in a subsequent pay period, not exceeding an ag-

gregate penalty of four thousand dollars ($ 4,000), and is entitled to an award of costs and reasonable attorney's fees.

Defendants argue that Plaintiffs cannot establish the requisite injury or knowing and intentional element that Section 226(e) requires.[6] CDN's wage statements consistently reflected 86.66 hours worked (regardless of the number of hours actually worked) and omitted the hourly wage paid, therefore an employee suffers injury because (1) the employee might not be paid overtime to which she was entitled and (2) the absence of an hourly rate prevents an employee from challenging the overtime rate paid by CDN. *Cf. Cicairos*, 133 Cal.App.4th at 955, 35 Cal.Rptr.3d 243 (explaining that Section 226 is violated if employees are required to perform "arithmetic computations" to determine their hourly rates).[7]

Additionally, this lawsuit, and the difficulty and expense Plaintiffs have encountered in attempting to reconstruct time and pay records, is further evidence of the injury suffered as a result of CDN's wage statements. Plaintiffs' ability to calculate unpaid and miscalculated overtime is com-

---

5. CDN states that the number 86.66 was arrived at by multiplying 40 hours of work per week by 52 weeks, and then dividing the total by 24, the number of pay periods in a year.

6. Even if Plaintiffs were unable to prove injury pursuant to Section 226(e), the finding of a violation of Section 226(a) would entitle Plaintiffs to injunctive relief and recovery of costs and attorney's fees. Cal. Labor Code § 226(g).

7. Plaintiffs also suggest that time records establish that some employees' wage statements underreported the number of actual hours worked in a pay period. Bibring Decl. in Opp., Ex. C ¶¶ 10–13. After reviewing Shiang Huang's time records, the parameters of the pay period is unclear. If, as Plaintiffs suggest, the pay period ran from Wednesday, July 16, 2003 to Thursday, July 31, 2003, then Huang worked 98 hours during the pay period. Not only were the actual hours worked

in excess of the 86.66 hours reported on Huang's wage statement, but she was only paid for 4.5 hours of overtime, leaving her with 93.5 non-overtime hours. If, however, the pay periods ran from Monday, July 7, 2003 to Friday, July 18, 2003 and from Monday, July 21, 2003 to Friday, August 1, 2003, then Huang worked 58 hours in the first pay period and 86.5 hours in the second pay period for which she was paid 6.5 hours of overtime. It is unclear whether CDN pays its employees semimonthly (twice a month on the 15th and 30th of the month) or bi-weekly (every other Friday) and without that information, this Court cannot resolve whether the employee was owed overtime. However, having found other injury suffered as a result of CDN's wage statements, the Court need not resolve the matter in order to grant summary judgment on this claim.

plicated by the missing information required by Section 226(a). The purpose of the requirement is that employees need not engage in the discovery and mathematical computations to analyze the very information that California law requires.

■ Defendants' argument that they have hired a company to process the wage statements, *see* Chen Decl. ¶ 14, does not relieve them of having to comply. Defendants concede that they knew their wage statements did not comply with California law. *See, e.g., id.* (nonexempt employees' wage statements always listed their hours at 86.66). Accordingly, Defendants had the responsibility to ameliorate the problem. Defendants' failure to do so and their stance that the violations are merely technical also demonstrate that the violations were knowing and intentional. Indeed, Plaintiffs point out, and Defendants do not dispute, CDN continues to issue wage statements containing identically deficient information. Having found that the wage statements CDN issues to nonexempt employees violates Cal. Labor Code § 226(a), that employees suffered injury, and that the violations were knowing and intentional, the Court GRANTS Plaintiffs' motion and DENIES Defendants' motion as to whether CDN's wage statements complied with California law. The Court finds that Plaintiffs are entitled to relief pursuant to Cal. Labor Code § 226(e) and (g).

## C. Whether CDN's Reporters Are Exempt Employees

■ Both parties move for summary judgment on the issue of whether CDN

reporters are entitled to overtime under either state or federal law. Defendants argue the reporters are not entitled because they fall within an exemption to FLSA. "Because of the remedial nature of the FLSA, exemptions are to be 'narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit.'" *Reich v. Newspapers of New England, Inc.,* 44 F.3d 1060, 1070 (1st Cir.1995); *Cleveland v. City of Los Angeles,* 420 F.3d 981, 988 (9th Cir.2005). FLSA should be interpreted liberally in the employee's favor. *Mitchell v. Lublin, McGaughy & Assoc.,* 358 U.S. 207, 211, 79 S.Ct. 260, 3 L.Ed.2d 243 (1959). Additionally, an employer who does not pay overtime bears the burden of proving an exemption by "clear and affirmative evidence." *Donovan v. United Video,* 725 F.2d 577, 581 (10th Cir.1984).

Defendants rely on 29 U.S.C. § 213(a)(1), which states that overtime rules do not apply to employees employed in a bona fide executive, administrative, or professional capacity. 29 U.S.C. § 213(a)(1).[8] Defendants assert that CDN reporters are professional employees within the meaning of FLSA, specifically arguing that CDN reporters fall within the "creative professional exemption."[9] 29 C.F.R. § 541.302 states that, "to qualify for the creative professional exemption, an employee's primary duty must be the performance of work requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor as opposed to routine mental, manual,

---

8. California law has incorporated the federal "professional employee" exemption in the Industrial Welfare Commission ("IWC") Wage Orders. IWC Wage Order 4–2000, 4–2001 § 1(A)(3)(d)(the professional exemption "is intended to be construed in accordance with . . . provisions of federal law as they existed as of the date of this Wage Order . . .").

9. Defendants' Motion and their opposition to Plaintiffs' Motion make clear that this is the only basis on which Defendant relies for the application of the "professional employee" exemption.

mechanical or physical work."[10] The regulation provides:

> Journalists may satisfy the duties requirements for the creative professional exemption if their primary duty is work requiring invention, imagination, originality or talent, as opposed to work which depends primarily on intelligence, diligence and accuracy. Employees of newspapers, magazines, television and other media are not exempt creative professionals if they only collect, organize and record information that is routine or already public, or if they do not contribute a unique interpretation or analysis to a news product. Thus, for example, newspaper reporters who merely rewrite press releases or who write standard recounts of public information by gathering facts on routine community events are not exempt creative professionals. Reporters also do not qualify as exempt creative professionals if their work product is subject to substantial control by the employer. However, journalists may qualify as exempt creative professionals if their primary duty is ... conducting investigative interviews; analyzing or interpreting public events; writing editorials, opinion columns or other commentary; or acting as a narrator or commentator.

29 C.F.R. § 541.302(d). The central question is whether the employee's *primary duty* entails work requiring invention, imagination, originality, or talent.

While various factors may be considered in determining what an employee's primary duty is, the core factor is how much time an employee spends doing exempt work. Generally, courts have inquired whether employees spend more than fifty percent of their time doing exempt work. And, in considering whether to apply the creative professional exemption to news reporters, courts have recognized that only a minority of reporters engage in work depending on invention, imagination, and talent. The majority of reporters do work which depends primarily on intelligence, diligence, and accuracy. *See, e.g., Reich v. Gateway Press, Inc.*, 13 F.3d 685 699–700 (3rd Cir.1994).

In determining whether an employee fits within the ambit of the exemption, courts first look to historical facts, regarding, for example, the day-to-day duties of the employees. *Newspapers of New England*, 44 F.3d at 1073. There are a number of disputes with regard to those "historical" facts, including: the substance of the work CDN reporters do; the expectations CDN has regarding its reporters' work; the amount of oversight CDN has over its reporters' product and choices about which stories to cover; the level of the reporters' education; the amount of commentary and investigation performed by the reporters; the analysis that goes into CDN news articles; the quality and sophistication of CDN reporters' work; the extent to which reporters conducted interviews and originated ideas; how often reporters wrote feature stories and re-write press releases; and how much autonomy reporters had over the content of their articles, who to interview, how much research to do, and how much supervision they received.[11]

---

10. While other factors may be considered by a court in determining what an employee's primary duty is, one of the core factors is how much time an employee spends doing exempt work. Generally, courts have inquired whether employees spend more than fifty percent of their time doing exempt work.

11. The Court notes that the majority of Defendants' evidence on this issue is in the form of declarations submitted by CDN supervisory employees. Many of the statements contained in these declarations consist of language taken word-for-word from court cases addressing the application of the creative professional exemption to news reporters. The

However, Plaintiffs contend that even if the facts (as opposed to the characterization of, or conclusions to be drawn from, the facts) identified by Defendants were undisputed, Plaintiffs would still be entitled to summary judgment on the issue.

■ There are only a few cases which have addressed whether newspaper reporters fall within the creative professional exemption. Courts have generally refused to apply the creative professional exemption to newspaper reporters. *See, e.g., Newspapers of New England,* 44 F.3d at 1065–66; *Gateway Press,* 13 F.3d at 699–700; *cf. Dalheim v. KDFW–TV,* 918 F.2d 1220, 1223 (5th Cir.1990) (involving television news reporters). Courts have noted that application of the creative professional exemption was limited to the minority of reporters. In discussing reporters at a smaller, regional newspaper, the *Gateway Press* court explained that if the reporters at issue in that case were to be found in the minority to whom the exemption applied, it would be difficult to see which reporters would not be covered by the exemption. 13 F.3d at 700. The *Gateway Press* court also noted that the "bread and butter work" of the reporters in that case was to collect information that was already out in the community and combine it into a single source. *Id.* Those reporters followed up on press releases, interviewed local officials, and recorded in their articles what they found. *Id.* The work did not require "any special imagination or skill at making a complicated thing seem simple...." *Id.* Similarly, the *Newspapers of New England* court declined to apply the

exemption despite the fact that the reporters there worked essentially unsupervised, had authority and discretion over what they did and wrote, and decided how their assignments would be executed. 44 F.3d at 1066. The court noted that those reporters' time was spent on hard news and general assignment work *Id.*

Indeed, there appears to only have been a single case in which a court found a newspaper reporter to be exempt. *Sherwood v. Washington Post,* 871 F.Supp. 1471 (D.D.C.1994).[12] The facts of *Sherwood* underscore how the exception proves the general rule that the exemption only applies to a small group of reporters. Sherwood was an investigative journalist for the Washington Post, a national, well-respected newspaper. *Id.* at 1472. He had been the bureau chief for the Post, covered D.C. government and Mayor Marion Barry. *Id.* He was later assigned to the Post's National Desk to cover the candidates for the office of U.S. vice president in 1988. *Id.* The *Sherwood* court noted that the job of a Washington Post reporter was a prestigious, competitive job among journalists. *Id.* at 1473. The court also found that Sherwood was required to cultivate sources, utilize his imagination, and other skills. *Id.* The court also pointed out that Sherwood acquired knowledge and expertise with respect to Virginia and D.C. politics. *Id.*

Even were the Court to rely on the facts identified by Defendants, CDN's reporters are altogether unlike Sherwood and are much closer to the reporters considered in

Court does not assess credibility in the context of a summary judgment motion.

**12.** Defendants also repeatedly cite the findings of a previous district court decision in *Sherwood v. Washington Post,* 677 F.Supp. 9 (D.D.C.1988). That decision, in the context of a summary judgment motion, held that thirteen reporters were exempt as creative profes-

sionals. However, the decision was reversed and remanded by the court of appeals. *Sherwood v. Washington Post,* 871 F.2d 1144 (D.C.Cir.1989). Indeed, after a bench trial, the district court issued a opinion which narrowly applied the exemption to a single highly decorated and experienced reporter. *Sherwood v. Washington Post,* 871 F.Supp. 1471 (D.D.C.1994).

*Gateway Press* and *Newspapers of New England.* There is no dispute that Defendant CDN is a smaller, regionally-oriented newspaper or that it has a small reporting staff consisting of approximately ten to fifteen news reporters, has a circulation of approximately 30,000, and covers predominantly Southern California events, focusing greatly on community goings-on.[13] There is also no material dispute that CDN reporters' primary duty consists of reporting, although they do, from time to time, write editorials or multi-story investigative articles. There is a dispute about how much of the reporters' work consists of investigative and other inventive and imaginative work.[14] However, even considering only Defendants' evidence, CDN's news reporters nonetheless do not fit within the exemption.

Defendants do not dispute that CDN reporters spend at least part of their time rewriting press releases and community events announcements nor that CDN requires that its reporters produce a daily quota of work, several thousand Chinese characters. It is also undisputed that a CDN newspaper is broken up into a section containing national and international news and a section containing local news. There is no material dispute that the first section's stories (national and international news) are almost entirely authored by reporters at CDN's larger offices such as New York and Taipei. Dep. of Jeff Horng at 36:16–37:23, 40:22–42:12. Nor is there a dispute that the local section's stories are entirely written by reporters in the Monterey Park office.

Additionally, both parties have submitted a number of news articles they suggest are typical of the reporting done by CDN reporters. *See, e.g.,* Decl. of Mike Cowling in Supp. of Defs.' Reply Brief ("Cowling Decl."), Ex. B (66 articles); Decl. of Peter Bibring in Supp. of Pls.' Mot. for Summ. J. ("Bibring Decl. in Supp."), Ex. A2 (25 articles). The parties suggest that the articles themselves are the best evidence of whether CDN reporters' "work requir[es] invention, imagination, originality or talent, as opposed to work which depends primarily on intelligence, diligence and accuracy." 29 C.F.R. § 541.302(d).

The submitted articles further underscore the inapplicability of the exemption to the facts presented here. Of the 66 articles attached to the Cowling declaration, the vast majority consist of press release rewrites about community events: one article contained information about a local concert benefit to assist Taiwanese victims of a typhoon (complete with contact information for interested readers), other stories discussed a China Airlines float in the annual Tournament of Roses Parade, the local reunion of a World War II tank crew, and a number of stories about the Los Angeles Taiwan Center. While there were a few editorials or articles that could be described as "investigative," many more were typified by the article titled, "A Visit to Glendale—Into the City!"—an article describing the res-

13. Defendants argue that the Court should consider the worldwide staff and circulation of CDN's parent corporation. However, only the Monterey Park CDN is a defendant in this case and Monterey Park's staff and circulation are the proper context for this analysis.

14. Defendants cite to isolated instances of investigative articles and editorial pieces. For example, CDN cites the deposition testimony of CDN newspaper reporters discussing. *See, e.g.,* Dep. of Ching Fang Chang at 77:5–7, 78:18–25, 79:2–80:15, 86:21–87:20, 88:6–90:13. However, Plaintiffs do not dispute that such pieces were written, they merely point out that the cited testimony demonstrates that such pieces were not typical of the work performed. *See, e.g., id.* at 106:17–108:18.

taurants, movie theaters, and shopping malls in Glendale. Another multi-page article was a tourism piece about a private residence in Zhenjiang, China.

Relying on these undisputed historical facts, or, where a dispute was identified, using Defendants' facts as suggested by Plaintiffs, the primary duty of CDN reporters depends primarily on their intelligence, diligence, and accuracy, rather than invention, imagination and talent. While Defendants did identify instances of what they described as investigative journalism, no material dispute prevents the Court from finding that CDN's news reporters' primary duty was indistinguishable from the majority of reporters such as the reporters in *Gateway Press* and *Newspapers of New England*. Accordingly, the Court finds that CDN's news reporters are neither exempt under FLSA nor California state law and DENIES Defendants' motion and GRANTS Plaintiffs' motion on this issue.

## II. Issue for Which Only Plaintiffs Seek Summary Judgment

### A. Whether CDN Miscalculates the Amount of Overtime Pay

Plaintiffs argue that Defendants improperly calculate the overtime rate paid to employees. Plaintiffs contend that bonuses and daily meal allowances paid by Defendants should be included when calculating employees' rate of pay for purposes of determining the overtime rate.

Non-exempt employees working overtime are entitled to pay at one-and-one-half times their regular rate of pay. The "regular rate" includes "all remuneration for employment paid to, or on behalf of the employee," not simply their base or hourly rate. 29 U.S.C. § 207(e).[15] There is a

"statutory presumption ... that remuneration in any form is included in the regular rate calculation. The burden is on the employer to establish that the remuneration in question falls under an exemption." *Madison v. Resources for Human Development, Inc.*, 233 F.3d 175, 187 (3rd Cir. 2000).

### 1. Annual Bonuses Paid by CDN

■ Discretionary bonuses may be excluded from the "regular rate" provided that the "fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer ... and not pursuant to any prior contract, agreement or promise causing the employee to expect such payments regularly." 29 U.S.C. § 207(e)(3)(a). However, bonuses which are based on objective criteria or that are routinely given may give rise to an implied bonus contract which must be included in the calculation of regular rate. *See* DLSE Enforcement Manual 34.4.4.

CDN's bonuses are nondiscretionary and performance-based, paid out to every employee every year. Additionally, because the size of the bonus is based on objective factors, including an employee's performance rating and pay rate, CDN does not determine the amount of the payment at its discretion. *See* Ellen C. Kearns, *The Fair Labor Standards Act* § 10.III.B.1 ("many types of bonus programs must be included in regular rate calculations, including attendance, quality, and production bonuses."). Plaintiffs point to Larry Wong's testimony at his deposition. Wong Dep. at 125:6–14 ("Q: Do they ever get a bonus? A: That would be like once a year ... the company will determine how much bonus to give each em-

---

**15.** California's IWC has adopted the federal definition of "regular rate." DLSE Enforcement Manual 49–1.

ployee based on their performance rating ... Q: So there is an annual bonus for all employees, based on their performance rating? A: Right.").[16]

Plaintiffs also point to the deposition testimony of Steven Gao, the CDN human resources director. Gao testified that employees received an "annual bonus" calculated based on employees' "performance, evaluation performance." Dep. of Steven Gao at 106:6–11, 106:22–107:2. Gao further testified that the "average" size of the annual bonus was 1 or 1.2 times their monthly salary. *Id.* at 106:12–24. While Defendants repeat that the bonus is "purely within the discretion of CDN," they provide no admissible evidence to create a dispute preventing resolution of the issue. Plaintiffs offer evidence that only once has an employee not received a bonus. This single example occurred after the employee testified before the National Labor Review Board about unionizing efforts. Decl. of Hsiao–Tse Chao in Supp. of Pls.' Mot. for Summ. J. ("Chao Decl.") ¶ 5. It was the only time in the employee's eighteen years at CDN that she did not receive a bonus or knew of any employee not receiving a bonus. *Id.* Defendants seize on Chao's declaration as evidence that the

bonuses were discretionary. However, Plaintiffs argue that evidence of a single example where an employee did not receive a bonus, especially in light of the circumstances, is powerful evidence that there was a custom of paying bonuses on an annual basis.[17] Defendants have provided no evidence of any other employee failing to receive a bonus.[18]

To the contrary, the evidence, including the testimony of Defendants' own witnesses (such as the deposition testimony of Steve Gao and Larry Wong), establishes that CDN's custom was to give bonuses to all employees on an annual basis. Courts have found that annual bonuses should be included in calculation of employees' regular rates even if the bonus is contingent on the company being in a healthy financial condition.

> We take it as admitted that the company was not legally obligated to pay the bonuses ... and that the company would have discontinued them 'if and when the company finances indicated an unhealthy condition.' But the undenied, crucial fact here is that in fact they were regularly paid.... [N]o one can doubt that the employees assumed that, in the normal course of events, the employees

---

**16.** Defendants point to Wong's declaration filed in support of Defendants' opposition in which Wong states that the bonus was discretionary and that not every employee gets an annual bonus. Wong Decl. in Opp. ¶ 17. However, as noted above in note 4, Wong cannot create a disputed fact simply by contradicting his own deposition testimony. *See Cleveland*, 526 U.S. at 806, 119 S.Ct. 1597. Additionally, the declaration Wong offers in opposition to Plaintiff's motion also contradicts the declaration Wong offered in support of Defendants' motion. Decl. of Larry Wong in Supp. of Defs.' Mot. for Summ. J. ("Wong Decl. in Supp.") ¶ 17 ("the amount of the bonus depends on profitability and each individual's performance. Department supervisors evaluate the employees from December of the previous year to November of the current year ... The employees generally receive

the bonus in January of the following year."). As above, the Court finds that Wong's declaration is sham and disregards it.

**17.** Indeed, there is evidence that CDN managers describe the annual bonus to new or prospective employees. Chao Decl. ¶ 6; Dep. of Chenyang Yan at 42:10–22. Defendants cite to ¶ 26 of Steve Gao's declaration to refute this, however no such paragraph is contained in the cited declaration. If CDN advertises its bonus policy, it would be further evidence supporting the inclusion of the bonus in the regular rate of pay.

**18.** Defendants cite to ¶ 17 of the Wong declaration, as addressed previously, the Court treats the declaration as sham, contradicted by his own deposition testimony and his other declaration.

would receive them. That seems to us to be enough to constitute them part of 'the regular rate at which' the men were employed.

*Walling v. Richmond Screw Anchor Co.,* 154 F.2d 780, 784–85 (2nd Cir.1946). Additionally, the bonuses are properly included as regular pay where the amount of the bonuses were objectively based. Plaintiffs' evidence and documents offered by Defendants' witnesses establish that the amount of a bonus was based on employees' performance. Decl. of Steven Gao in Supp. of Defs.' Mot. for Summ. J. ("Gao Decl. in Supp."), Ex. B. Where a bonus system induces employees "to work more steadily or more rapidly or more efficiently or remain with the firm" it is properly considered part of their regular rate of pay. 29 C.F.R. § 778.211(c).

Accordingly, in light of the undisputed evidence and absence of any material disputes, the Court finds that CDN gave its employees bonuses on an annual basis and that the bonuses should have been included as remuneration under FLSA and California state law for the purpose of calculating the regular pay rate.

### 2. Meal Allowances Paid By CDN

■ Plaintiffs also argue that Defendants improperly exclude the $ 4 daily meal allowance paid to employees from the calculation of the regular rate of pay. Plaintiffs point out that daily meal allowances do not fall into one of the specifically enumerated exceptions to 29 U.S.C. § 207(e). Further, 29 C.F.R. § 778.217(d) states that reimbursements for expenses that are for the employee's benefit are included in the employee's regular rate.

The expenses for which reimbursement is made must, in order to merit exclusion from the regular rate under this section, be expenses incurred by the employee on the employer's behalf or for his benefit or convenience. *If the em-*

*ployer reimburses the employee for expenses normally incurred by the employee for his own benefit, he is of course, increasing the employee's regular rate thereby. An employee normally incurs expenses in ... buying lunch.... If the employer reimburses him for these normal everyday expenses, the payment is not excluded from the regular rate as "reimbursement for expenses." ... the amount paid to the employee ... enters into the regular rate of pay as discussed in § 778.116.*

29 C.F.R. § 778.217(d) (emphasis added). There is no dispute CDN gives every employee $ 4 as a meal allowance for every day worked. Gao Dep. at 108:4–109:2. Additionally, that amount is listed on employees' paychecks as taxable wages and taxes were deducted accordingly. *Id.* Employees do not have to show receipts in order to receive the money. *Id.* It is also undisputed that CDN does not factor the $ 4 into employees' compensation for determining the regular rate of pay for overtime purposes.

Defendants argue that the meal allowance is to reimburse employees for expenses incurred for CDN's convenience. Defendants' basic argument is that the meal allowance is provided by CDN so that employees can purchase lunch and eat in close proximity to work so that employees will not return late from lunch and will be more productive. Defendants cite 29 C.F.R. § 778.217(a) which states that expenses incurred by employees for their employer's convenience are excluded from the employee's regular wage rate. However, Defendants do not provide any evidence that would create a genuine dispute of fact. There is no evidence, for example, that employees eat close by nor that CDN does anything to ensure that employees eat close by. Accordingly, there is no evidence that employees are actually incur-

ring an expense for CDN's convenience. In light of the undisputed evidence, the Court finds that CDN's daily meal allowance is to reimburse employees for expenses incurred for the employees' benefit.

Defendants had the burden of proof to show that remuneration fell within an exemption. Having failed to provide evidence of a material dispute of fact, the Court finds that the annual bonuses and daily meal allowances paid to employees should have been included when calculating employees' regular rate of pay.

## III. Issues for Which Only Defendants Seek Summary Judgment

### A. Whether CDN Always Provided Meal and Rest Periods

Cal. Labor Code §§ 226.7 and 512 require employers to provide meal and rest periods to its employees. If an employer fails to provide such breaks, Section 226.7(b) requires the employer to pay the employee one additional hour of pay at the employee's regular rate for each day that a meal or rest period was not provided. Cal. Labor Code § 226.7(b). Plaintiffs' complaint alleges that Defendants routinely denied its employees such breaks yet failed to provide them with the required additional compensation. Defendants seek summary judgment and the parties' arguments focus on the relevant statute of limitations and whether evidence exists in support of Plaintiffs' claims.

#### 1. What Statute of Limitations Applies to This Claim

The parties disagree as to whether a one--or four-year statute of limitations applies to this claim. The core issue is whether compensation paid for missed meal and rest periods is appropriately characterized as wages or a penalty. If the compensation is characterized as a wage, Plaintiffs argue a four-year statute of limitations applies pursuant to Cal.Code. Civ. Proc. § 338 and Cal. Bus. and Prof. Code § 17208.[19] If, however, it is characterized as a penalty, then a one-year period applies pursuant to Cal.Code Civ. Proc. § 340(a). California appellate courts have split on the issue. *Compare, e.g., Nat'l Steel and Shipbuilding Co. v. Superior Court,* 135 Cal.App.4th 1072, 38 Cal. Rptr.3d 253 (2006)(characterizing payments as wages) *with Mills v. Superior Court,* 135 Cal.App.4th 1547, 38 Cal. Rptr.3d 497 (2006) (characterizing payments as penalties).[20] The California Supreme Court recently granted review of the question in *Murphy v. Kenneth Cole Productions,* 134 Cal.App.4th 728, 36 Cal. Rptr.3d 418 (2005), *superseded by grant of review* on Feb. 22, 2006. Because the state supreme court has not yet resolved the matter, it is left to this Court to determine the issue. *Vernon v. City of Los Angeles,* 27 F.3d 1385, 1391 (9th Cir.1994).

After reading the various California appellate opinions on the matter, this Court finds that the stronger and more persuasive argument is in favor of characterizing the compensation as a wage, and thus applying the longer statute of limitations. Courts that have so found have noted that payments for violations of the meal and rest period requirements are restitutionary in nature. Employees earn an additional hour of pay when they have not been given their break. Such compensation is akin to the payment of overtime wages.

---

**19.** Section 338 actually provides for a three-year statute of limitations. Section 17208 provides for a four-year statute of limitations.

**20.** The federal courts that have addressed the issue have uniformly held that the compensa-

tion paid under Section 226.7 is properly characterized as a wage. *See Tomlinson v. Indymac Bank, F.S.B.,* 359 F.Supp.2d 891 (C.D.Cal.2005); *Cornn v. United Parcel Service, Inc.,* 2005 WL 588431 (N.D.Cal.2005).

Second, courts have noted that characterizing the compensation as wages is consistent with the definition of wages found in the California Labor Code, which is "all amounts for labor performed by employees." Under Section 226.7, employees are paid an amount for labor performed during their meal break or rest period. Third, courts have held that the statute is self-executing, which further supports that the compensation is not a penalty, The statute creates an affirmative duty on the employer to provide one hour's pay for each day an employee works through her meal or rest period. Thus, the employee is immediately entitled to the Section 226.7 payment, akin to the immediate entitlement to overtime. *See, e.g., National Steel & Shipbuilding Co. v. Superior Court*, 38 Cal.Rptr.3d 253 (2006). The Court finds that Section 226.7 compensation is properly characterized as wages and accordingly finds that the four-year statute of limitation applies here.

## 2. Whether Evidence Supports Plaintiffs' Claim

■ Defendants argue that Plaintiffs have provided no evidence to support their claims that CDN employees do not receive or take meal or rest breaks. Plaintiffs initially note that the law imposes the burden on Defendants to ensure compliance with the meal periods provision. Section 11 of the applicable IWC wage order states that "no employer shall employ a work period of more than five (5) hours without a meal period.... *Unless the employee is relieved of all duty* during a 30 minute meal period, the meal period shall be ... counted as time worked." [21] (emphasis added). Plaintiffs present evidence that a significant portion of Defendants' time records reflect no meal periods at all. Bibring Decl. in Opp., Ex. FF (records indicating significant number of missed meal and rest periods). Testimony offered by Plaintiffs also establishes that many employees' meal and rest breaks were missed or interrupted because of too much work, and that no one told employees they were entitled to meal or rest breaks. *See, e.g.,* Dep. of Jing Hua Zhang at 72:17–75:20; Dep. of Jeffrey Sun at 83:24–84:21; Dep. of Yu Fan Ines Kai at 46:15–47:2.[22]

There is no material dispute that at least some, and perhaps many, employees were unable to take their meal and rest periods.[23] Defendants' failure to ensure that its employees took their meal breaks and evidence of pressure to forego rest breaks in the interest of productivity constitute violations of Sections 226.7 and 512. Although there may be some employees who often (or even always) took their required

---

21. Orders of the IWC govern wage, hour, and working conditions in California. Cal. Labor Code § 1173. Additionally, the DLSE Manual § 45.2.1 states that it is the employer's burden to compel the worker to cease work during the meal period.

22. Defendants argue that some Plaintiffs admitted that they took and received meal and rest periods. However, the cited testimony does not establish that Plaintiffs were always allowed to take meal and rest periods. To the contrary, some of the testimony which Defendants cite establishes that Plaintiffs were forced to miss meal periods. *See, e.g.,* Dep. of Isen Huang at 50:4–8 ("Q: And did this lunch group eat lunch together every day? A: Not really. Sometimes we have—because we have to take care of customers, we may stay at the office to finish our job.").

23. Defendants cite the declaration of Andrew Sun, one of the CDN editors. Sun states that it was "generally up to [the reporters] to decide when to take their rest periods and meal periods." Decl. of Jeffrey Sun in Supp. of Defs.' Mot. for Summ. J. ("J. Sun Decl.") ¶ 13. The statement, however, does not purport to establish that employees always received their meal and rest periods. Defendants also cite the declaration of Grant Wu. The Court, in a separate order, has stricken Wu's declaration.

breaks and others who rarely took any, that implicates the size of damages, not the existence of liability. However, as Plaintiffs have not moved for summary judgment as to this issue, the Court DE-NIES Defendants' motion, finding that undisputed evidence establishes violations of Sections 226.7 and 512.

### B. Whether CDN Knew That Plaintiffs Worked Overtime

Defendants argue that they are not liable for any allegedly unpaid overtime because CDN did not know, nor should have known, about any overtime hours allegedly worked. Defendants cite a Ninth Circuit case holding that, where an employer has no knowledge that an employee is engaging in overtime work and the employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the failure to pay overtime is not a violation of the law. *Forrester v. Roth's I.G.A. Foodliner, Inc.,* 646 F.2d 413, 414 (9th Cir.1981). Defendants point to the testimony of several Plaintiffs who testified that they did not record or report overtime hours which they now claim they worked. However, the facts of this case are materially different from *Forrester.* Most significantly, CDN has affirmatively represented to many Plaintiffs that they are exempt employees and are thus not entitled to overtime. Accordingly, Plaintiffs' failure to record overtime hours may be a result of Defendants' own affirmative conduct.[24]

Plaintiffs also offers evidence that (1) reporters complained about overtime in a 2001 meeting; (2) Defendants used to pay overtime to reporters and discontinued that practice several years ago without changing the reporters' job duties; (3) reporters had regular contact with their edi-

tors concerning work in progress from early in the morning until late in the evening; and (4) one Plaintiff testified that she was told by her supervisor that she could not write down more than eight hours per day on her time sheet regardless of how many hours she worked. *See, e.g.,* Dep. of Andrew Sun at 31:7–9, 39:10–40:8; Dep. of Hsiao–Tse Chao at 54:9–13, 157:3–158:10; Yan Dep. at 49:1–50:15, 73:3–74:11, 113:7–10; Kai Dep. at 45:14–46:18, 47:12–49:1. State and federal cases have consistently held that employers can be liable for even unauthorized overtime when the employer permitted the work time. *See Morillion v. Royal Packing Co.,* 22 Cal.4th 575, 582, 94 Cal.Rptr.2d 3, 995 P.2d 139 (2000); *Lindow v. United States,* 738 F.2d 1057, 1060–61 (9th Cir.1984).

The Court finds that Defendants knew or should have known that employees were working in excess of eight hours a day and forty hours a week. Defendants' representation that many of its employees were exempt caused employees not to record overtime hours. Additionally, the Court finds that Defendants had actual and constructive notice that employees were working overtime. Accordingly, the Court DENIES Defendants' motion as to this issue.

### C. Whether Salespersons Worked Overtime

Defendants argue that Plaintiffs have not, and cannot, establish that any salespersons worked in excess of eight hours a day or forty hours a week. Defendants point to the testimony of Grant Wu, a CDN salesperson, to establish that salespeople worked less than those amounts. However, the Court has stricken the declaration of Grant Wu in a separately issued

---

**24.** Additionally, Plaintiffs offer testimony that some employees kept logs of the hours they worked, while others told their supervisor

how many hours they had worked. Dep. of Lynne Wang at 18:11–19:25; Dep. of Hui Jung Pao at 197:10–24.

order. *See* June 7, 2006 Order. Additionally, Plaintiffs have provided evidence that salespersons worked overtime. *See, e.g.,* Huang Dep. at 26:21–29:13; Pao Dep. at 180:8–14. It is also undisputed that Defendants classified salespersons as exempt employees and did not keep track of their time. The U.S. Supreme Court has held that where a company failed to keep records of hours worked, the presentation of evidence by the employees as to their own hours creates a rebuttable presumption that employees worked those hours. *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687–88, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946). Accordingly, having found material disputes as to whether salespersons worked overtime, the Court DENIES Defendants' motion as to this issue.

### D. Whether CDN's Salespersons Are Exempt Employees

Defendants argue that their salespersons are exempt from overtime provisions of federal and state law. Exemptions "are to be narrowly construed against the employers seeking to assert them." *Cleveland,* 420 F.3d at 988. Employers, therefore, have the burden to prove that employees meet each element of an asserted exemption, fitting "'plainly and unmistakably' within the terms and spirit of the exemption." *Id.* Defendants assert that their salespeople fit into two exemptions, the commissioned salesperson exemption and the outside salespeople exemption.

### 1. Commissioned Salesperson Exemption

■ 29 U.S.C. § 207(i) states that an employer does not violate FLSA overtime rules where it employs employees at a retail or service establishment in excess of

the applicable workweek if (1) the employee receives more than 1.5 times the minimum wage and (2) more than half the employee's compensation represents commission on goods or services. 29 U.S.C. § 207(i). It is undisputed that CDN salespersons receive more than 1.5 times the minimum wage. Defendants contend that more than half of CDN salespersons' compensation represents commissions on goods or services.

However, in order for the exemption to apply, Defendants must establish that CDN is a retail or service establishment. Defendants contend that CDN is a retail establishment. However, 29 C.F.R. § 779.317, which is a "partial list of establishments lacking 'retail concept,'" specifically states that newspaper publishers are "establishments to which the retail concept does not apply." *See also Wirtz v. Idaho Sheet Metal Works, Inc.,* 335 F.2d 952, 956 (9th Cir.1964) (noting exemption applies only to establishments as are comparable to the "local merchant, corner grocer or filling station operator who sells to or serves ultimate consumers."). Accordingly, because CDN is not a retail or service establishment within the meaning of Section 207(i), the Court finds that CDN's salespersons are not exempt from FLSA.

■ However, Defendants also argue that their salespersons are exempt under California law from state overtime provisions. Section 3(D) of the applicable IWC Wage Order states that employees who receive more than half their compensation in commissions and whose regular rates of pay exceed 1.5 times the minimum wage are exempt from overtime protections.[25] Plaintiffs identify material issues in dispute with regard to whether employees receive more than half their compensation

---

**25.** This is essentially the same requirement as the federal commissioned employee exemption with one critical difference. There is no requirement that the employer be a retail or service establishment under state law.

in commissions. *See* Pao Dep. at 74:14–16; Bibring Decl. in Opp., Ex. DD.

Additionally, with regard to whether CDN salespersons receive "commissions" as that word is meant under California law, the compensation scheme must meet two requirements. First, the employee must be involved principally in selling a product or a service. Second, the amount of the employee's compensation must be a percent of the price of the product or service. *Ramirez v. Yosemite Water Co.,* 20 Cal.4th 785, 803–04, 85 Cal.Rptr.2d 844, 978 P.2d 2 (1999). While there is no dispute that CDN salespersons' principal duties were to sell advertising, Defendants provide no evidence establishing on what salespersons' commissions are based. If, for example, salespersons receive commissions based on the number or size of the ads sold, then their compensation does not constitute a commission within the meaning of state law. Because Defendants have the burden of demonstrating the application of an exemption, Defendants bear the burden of proof in order to obtain summary judgment on the issue.[26] Accordingly, the Court finds that material facts in dispute prevent the granting of summary judgment as to the applicability of the state commissioned employees exemption.

### 2. Outside Salesperson Exemption

■ Defendants alternatively argue that CDN salespersons are exempt from federal and state overtime under 29 U.S.C. § 213(a)(1) which exempts outside salespersons. Until 2004, 29 C.F.R. § 541.500 defined outside sales employees as employees whose primary duty is making sales and who spent less than twenty percent of

their hours engaged in work other than outside sales. In revised regulations effective August 23, 2004, the Department of Labor eliminated the twenty percent standard.[27] The exemption now applies to a salesperson "customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500(a).

Plaintiffs initially argue that, because the modification alters the right to overtime for sales employees, the new regulation should not be applied retroactively. *Frost v. Barnhart,* 314 F.3d 359, 371 (9th Cir.2002); *Landgraf v. USI Film Products,* 511 U.S. 244, 278, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Defendants fail to provide evidence, as is their burden, establishing that salespeople spent less than twenty percent of their time engaged in activities unrelated to outside sales. To the contrary, Plaintiffs provide evidence that there was no expectation imposed by Defendants about how much time employees should spend outside of the office and, further, that employees spent only about 20 to 30 percent of their work time engaged in outside sales. *See, e.g.,* Pao Dep. at 182:15–183:4; Huang Dep. at 152:18–153:17. Accordingly, the Court finds that under the regulations in effect at the time of the filing of this action, CDN salespersons did not fall within the outside salesperson exemption.

Even considering the more flexible standard contained in both the current federal regulation as well as the language of the California's outside salesperson exemption (requiring more than half an employee's working time be spent outside the office; Cal. Labor Code § 1171; IWC Wage Order 4(2)(M)), genuine issues exist as to

---

**26.** Defendants assert that employees' commissions are a percentage of the price of the advertising product sold. However, they provide no evidence to support this conclusory statement. The declaration of Grant Wu, the

one declaration that discussed, in the barest fashion, the issue has been stricken.

**27.** This suit was filed in March 2004.

how much time CDN's salepersons spend outside the office. *See, e.g.,* Pao Dep. at 182:15–183:4; Huang Dep. at 152:18–153:17. There is no evidence to support Defendants' argument that salespersons who spend less than half their time outside the office may still be exempt. Defendants point to 29 C.F.R. § 541.700(a), which identifies various factors a court can consider in determining an employee's "primary duty." Defendants provide evidence of the "relative freedom from direct supervision" as additional support for application of the exemption. However, Plaintiffs present evidence demonstrating the amount of supervision employees have when conducting their salesperson duties. *See, e.g.,* Huang Dep. at 23:11–18, 126:17–127:15, 140:4–141:8; Pao Dep. at 77:15–78:22, 193:21–194:11.

Based on the foregoing, the Court finds that the regulations in effect at the time of the filing of this suit governs the inquiry into whether CDN salespersons fall within the exemption to FLSA. The Court finds that undisputed evidence establishes that CDN salespersons spent more than twenty percent of their time doing work other than outside sales. The Court further finds that CDN salespersons do not fall into the outside salesperson exemption contained in 29 U.S.C. § 213(a)(1). With regard to the state outside salesperson exemption, the Court finds that Plaintiffs have identified material disputes as to whether salespersons spent more than half of their work time engaged in outside sales. Accordingly, the Court DENIES Defendants' motion with regard to this issue.

## IV. Evidentiary Objections

### A. Plaintiffs' Objections

#### 1. Objections to Declaration of Andrew Sun

Plaintiffs raise identical objections in response to ¶¶ 4–13, invoking Fed. R.Evid. 401, 402, 602, and 701. Sun was a CDN staff reporter for a number of years, and later became a City Editor, during which he was in charge of all the reporters. Sun has the requisite personal knowledge. Plaintiff also objects to ¶ 11 on the basis that Sun misstates the contents of a performance review that has been attached to the declaration. A review of the performance review makes clear that it does not contain the statements Sun says it contains. The Court SUSTAINS Plaintiffs' objection to ¶ 11 and OVERRULES the remaining objections.

#### 2. Objections to Declaration of Irene Chen

Plaintiffs raise identical objections in response to ¶¶ 4–9, arguing that the declaration is irrelevant, lacks foundation, and lacks personal knowledge. Employed in the Accounting Department, Chen was responsible for processing payroll and tracking employees' vacation and has the knowledge to testify about CDN's vacation policy and wage statements. Plaintiffs also object to ¶ 7 on the basis that it makes an inadmissible legal conclusion. The paragraph contains Chen's legal opinion regarding the permissibility of the vacation policy. The Court SUSTAINS Plaintiffs' objections to ¶ 7 and OVERRULES the remaining objections.

#### 3. Objections to Declaration of Larry Wong

Plaintiffs raise identical objections to ¶¶ 4–12, 17, arguing the declaration is irrelevant, lacks foundation, contains inadmissible lay opinions. Wong is a labor and human resources consultant for CDN who has reviewed and analyzed CDN's employment policies and practices and thus has personal knowledge about the general policies and practices. However, Wong does not establish personal knowledge of the

day-to-day workings of the reporters and salespersons. ¶ 10 of the declaration contains inadmissible legal conclusions. The Court SUSTAINS Plaintiffs' objections as to ¶¶ 4–6, 10, and OVERRULES the remaining objections.

#### 4. Objections to Declaration of Steven Tung Lien Gao

 Plaintiffs raise identical objections to ¶¶ 6–13, arguing the declaration is irrelevant, lacks foundation, contains inadmissible lay opinions and legal conclusions. Gao is the human resources manager and oversees operations at CDN and has knowledge of the employees, managers, payroll practices, CDN records and labor and employment policies. In ¶ 13, Gao states that meal and rest periods were actually provided. While Gao can speak to the policy, he has not established the requisite personal knowledge to state that employees actually took meal and rest periods. The Court SUSTAINS Plaintiffs' objection to ¶ 13 and OVERRULES the remaining objections.

#### 5. Objections to Declaration of Grant Wu

The Court has already stricken the declaration of Grant Wu in its June 7, 2006 Order.

### B. Defendants' Objections

#### 1. Objections to the Use of Deposition Transcripts

Defendants raise an identical objection to various sets of deposition excerpts offered by Plaintiffs. Specifically, Defendants identify deposition excerpts of Lynne Wang, Chenyang Yan, Larry Hing Wong, Ching Fang Chang, Andrew Sun, Steve Gao, Jeff Horng, Irene H. Chen, Hsiao–Tse Chao, and Hui Jung Pao. With regard to each of these transcripts, Defendants object on the basis that Plaintiffs failed to mark the deposition transcripts as

required by L.R. 16–2.7. L.R. 32–1 establishes that deposition transcripts to be used at trial or for a motion be marked as required by L.R. 16–2.7, which, in turn, requires that a party mark transcripts with brackets around the questions and answers sought to be used. While Plaintiffs have not marked individual question and answer exchanges, they have attached the entire copy of the transcripts of the various depositions and made specific page and line references to exchanges in its briefs. Accordingly, Defendants' assertion that Plaintiffs have made it impossible for Defendants to prepare its opposition is without merit. The Court OVERRULES Defendants' objections.

#### 2. Objection to Declaration of Bob Baker

Bob Baker is one of Plaintiffs' expert, who purports to opine about CDN's reporters. He has been a reporter and editor for thirty-five years, working for the Los Angeles Times for twenty-six years. He was also an editor, supervising general assignment, as well as beat, reporters. He was the first full-time writing coach at the Los Angeles Times, focusing on the reporting and writing process. Baker's declaration discussed the duties, work product, and work environment of CDN reporters and compared that to the Los Angeles Times. Defendants assert identical objections to ¶¶ 3–29 of the declaration, arguing that Baker's opinion is based on insufficient facts or data in violation of Fed. R.Evid. 702, that his opinion is not the product of reliable principles and methods, that his statements are irrelevant, contain impermissible legal conclusions, and the factual basis for the opinion is not stated in the declaration.

Baker's opinion is based on his lengthy and varied experience, his review of the deposition of CDN reporters and editors,

and twenty-five articles written by four reporters. Defendants' argument focusing on four reporters is an insufficient basis for an opinion is groundless in light of the fact that CDN only employs nine reporters.[28] Baker's statements are relevant to the issue of whether the reporters are exempt from FLSA and state law wage and hour protections.

■ Baker's declaration does not contain impermissible legal conclusions. While he does discuss issues that courts have considered in deciding whether news reporters are exempt, they are factual considerations on which Baker is allowed to opine. Finally, with regard to Defendant's *Daubert* argument, reliability exists where an expert's conclusions are based on his or her knowledge and experience rather than subjective belief. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Here, in light of Baker's extensive experience as a reporter and editor, together with his specialization in focusing on the reporting and writing process, Baker's opinions are based on his knowledge and experience rather than his subjective believe and thus reliable under *Daubert.* The Court OVERRULES Defendants' objections to Baker's declaration.

### 3. Objection to Declaration of Carrie Biggs–Adams

■ Biggs–Adams is employed by the Newspaper Guild, a division of the Communication Workers of America. As part of her job she collects, coordinates, and analyzes labor contracts between the locals of the Newspaper Guilds and the employers. Biggs–Adams' declares that all of the contracts require additional compensation for extra work. She then goes on to summarize the overtime provisions of various contracts. Defendants object to ¶¶ 3–4 and 6, arguing that Biggs–Adams lacks personal knowledge, is irrelevant, states a legal conclusion, and is not the best evidence. The paragraphs contain a description of Biggs–Adams' duties and job history. She has personal knowledge to so declare and it is relevant to forming a basis for her testimony. Paragraph 6 discusses the requirements for overtime contained within the contracts between newspapers and reporters, which is neither irrelevant nor an impermissible legal conclusion. Additionally, the statement is not offered to prove the contents of the documents themselves, but rather to discuss the industry practice.

■ Defendants also object to ¶ 7 on the basis of hearsay and best evidence rules. Paragraph 7 seeks to offer the contents of the documents and is not the best evidence. The Court SUSTAINS Defendants' objection to ¶ 7 and OVERRULE the remainder of the objections.

### 4. Objection to Declaration of Stephanie Rizzardi–Pearson

Rizzardi–Pearson is Plaintiffs' expert retained to analyze the wage and hour records and wage and hour losses. Initially, Defendants object on the basis that the Rizzardi–Pearson's complete expert report was not timely produced. That argument has been rejected in a May 9, 2006 minute order. Additionally, Defendants assert identical objections to ¶¶ 4–16 on the basis of the best evidence rule. However, where Rizzardi–Pearson discusses the contents of specific documents, she attaches the documents to which she refers. Defendants also object that the declarant failed to set forth her reasoning process, but the declaration merely describes the contents of the

---

**28.** Defendants make much of the fact that the four reporters are members of this lawsuit. However, the articles were written before the lawsuit was filed and therefore the reporters had no litigation motive to write in a style different from what they typically wrote.

various wage statements and records and, as such, there is no reasoning process to set forth. Additionally, Defendants' objection on the basis of relevance is groundless as the declaration is relevant to the issue of whether Defendants complied with state and federal wage and hour laws.

Defendants also argue that the declaration does not constitute expert testimony. However, it does not appear that the testimony is being offered as expert testimony, but rather to set out the contents of Defendants' documents and describe why they run afoul of wage and hour law. The Court OVERRULES Defendants' objections.

### 5. Objections Raised to Legal Authority Submitted by Plaintiffs

██ Plaintiffs submitted excerpts from the Cal. Dept. of Lab. Standards Enforcement ("DLSE") Enforcement Policies and Interpretations Manual, the Dept. of Lab. Wage and Hour Division Opinion Letter dated July 5, 2005, and excerpts from the DOL Field Operating Handbook. Defendants object on the basis that the legal authority has not been properly authenticated and Plaintiffs failed to ask the Court to take judicial notice of the authority. The documents are not certified, nor do they bear a signature of the author. The documents do not fit within the official records exception as a self-authenticating document. The Court SUSTAINS Defendants' objections to the documents produced by Plaintiffs.

### CONCLUSION

Based on the foregoing, the Court GRANTS Plaintiffs' motion and DENIES Defendants' motion with regard to (1) CDN's vacation buy-back policy; (2) CDN's wage statements; and (3) whether CDN's reporters are exempt under state or federal law. Additionally, the Court GRANTS Plaintiffs' motion with regard to the inclusion of bonuses and meal allowances in the calculation of the regular rate of pay. Finally, the Court DENIES Defendants' motion with regard to (1) whether CDN always provided meal and rest periods; (2) whether CDN knew that Plaintiffs worked overtime; (3) whether CDN salespersons worked overtime; and (4) whether CDN salespersons are exempt employees under state and federal law. IT IS SO ORDERED.